In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-3719

ELISHA HUNTER, individually and as Personal
Representative of the Estate of Stanley Bell, deceased,

*Plaintiff-Appellant,*

*v.*

HETAL AMIN, M.D., et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:07-cv-00296-DRH-PMF—**David R. Herndon,** *Chief Judge.*

ARGUED MAY 5, 2009—DECIDED OCTOBER 1, 2009

Before RIPPLE and SYKES, *Circuit Judges*, and LAWRENCE,
*District Judge.**

LAWRENCE, *District Judge.* Elisha Hunter filed this
action on her own behalf and as personal representative

---

* The Honorable William T. Lawrence, United States District
Judge for the Southern District of Indiana, is sitting by designa-
tion.

of the estate of her deceased brother, Stanley Bell, against numerous defendants whom she alleged were liable for Bell's death in the St. Clair County, Illinois, jail. The district court granted summary judgment in favor of all of the defendants on all of Hunter's claims; Hunter now appeals portions of that ruling. For the reasons set forth in this opinion, we affirm in part and reverse and remand in part the judgment of the district court.

## I.  BACKGROUND

### A.  Facts

When Stanley Bell arrived at the St. Clair County, Illinois, jail on April 13, 2005, as a federal pretrial detainee, he was taking three prescription medications: amitriptyline, an antidepressant that was prescribed as a sleep aid; Prozac, an antidepressant; and hydroxyzine, an antihistamine that is used to treat anxiety. Because amitriptyline was barred at the jail pursuant to an Illinois Department of Corrections policy, Dr. Hetal Amin, a psychiatrist who was under contract with the jail, was consulted by jail personnel the day after Bell's arrival regarding his prescription for the drug. Dr. Amin prescribed a different sleep aid, trazodone, in place of amitriptyline.

On April 21, 2005, during his regular weekly visit to the jail, Dr. Amin met with Bell to conduct a psychiatric examination. Bell, who suffered from bipolar affective disorder, became highly agitated and refused to talk with Dr. Amin in the presence of a jail officer, insisting that he was entitled to a private consultation with the doctor. It was the jail's policy—consistent with a state

regulation—that a correctional officer be present during all inmate medical examinations. In the case of Bell, Dr. Amin felt it was especially important for his own safety to have an officer present because Bell's file indicated that he had attacked an officer at another institution. A standoff ensued, with Bell growing increasingly belligerent and refusing to participate in an examination until the jail officer left the room and Dr. Amin refusing to conduct the examination without the jail officer being present.

Dr. Amin explained to Bell that his medications would be discontinued unless he was able to conduct an examination; Bell still refused to submit to an exam in the presence of a jail officer. Dr. Amin then determined that Bell was refusing treatment and asked Bell to sign a "Release of Responsibility" form so indicating. Bell refused to sign the form, instead wadding it up and throwing it. Dr. Amin believed that Bell was experiencing a manic episode, which he attributed to the fact that Bell was taking an antidepressant (Prozac) which can cause manic episodes in individuals with bipolar disorders. Therefore, Dr. Amin decided that the best course of action would be to discontinue Bell's antidepressant, which he believed would bring him down from his manic episode. Dr. Amin also suspected that Bell should be taking a mood stabilizer, but he could not make that determination without conducting an examination. Because Bell refused to consent to an examination, Dr. Amin discontinued all of Bell's medications and planned to try to examine him again the following week when he returned to the jail. Unfortunately, Bell committed suicide on April 23, 2005, leaving behind a note that said, among other

things, that St. Clair County was responsible for his death because it had taken away his medication.

## B. Proceedings Below

Hunter's complaint asserted a claim pursuant to 42 U.S.C. § 1983 against Dr. Amin, St. Clair County Sheriff Mearl Justice, and St. Clair County, as well as two counts of medical malpractice (one alleging loss of chance of survival and the other alleging wrongful death) against those defendants plus two unnamed employees of the jail. The district court dismissed the medical malpractice claims against Sheriff Justice early in the case; that ruling has not been appealed. The defendants later moved for summary judgment on the remaining claims; those motions were granted in their entirety and the district court entered judgment in favor of all of the defendants.[1]

## II. DISCUSSION

Hunter filed a timely appeal in which she addresses two aspects of the district court's ruling.[2] First, she appeals the court's ruling that the County's policy of requiring a corrections officer to be present during psychiatric exami-

---

[1] The district court dismissed *sua sponte* Hunter's claims against the unnamed defendants; that ruling is not appealed.

[2] Hunter does not appeal the district court's ruling regarding either her § 1983 claim against Dr. Amin or her medical malpractice claims against the County.

nations at the jail did not violate Bell's constitutional right to adequate mental health treatment. Second, she appeals the court's determination that, as a result of Bell's refusal of treatment, Dr. Amin had no duty toward him and therefore cannot be liable for medical malpractice.

We review the district court's grant of summary judgment *de novo*. Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007).

## A. Section 1983 Claim Against the County

The district court found that the County's policy of requiring a corrections officer to be present during psychiatric examinations at the jail did not violate Bell's constitutional right to adequate mental health treatment and therefore granted summary judgment in favor of the

County on Hunter's § 1983 claim. Hunter challenges that finding.

"A municipality may be liable for harm to persons incarcerated under its authority if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners." *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 530-31 (7th Cir. 2000) (citation and internal quotation marks omitted). Municipal liability under § 1983 is appropriate only when the policy in question is the "direct cause" or "moving force" behind a constitutional violation. *Id.*

In this case, while there is no question that the jail had an express policy that prevented Bell from speaking to Dr. Amin without a jail officer being present, that policy did not cause any violation of Bell's constitutional rights. Hunter correctly notes that the Illinois Rules of Civil Procedure provide that physician-patient communications are, with certain enumerated exceptions, privileged from disclosure in legal actions. *See* 735 ILCS 5/8-802. In addition, the Illinois Mental Health and Developmental Disabilities Confidentiality Act ("the Act") provides that communications between a patient and a psychiatrist are confidential and may not be disclosed except under certain circumstances. 740 ILCS 110/3(a). Clearly, however, neither of these statutes creates or suggests the existence of a constitutional right of any kind. Both statutes, as well as the federal patient-therapist privilege recognized in *Jaffee v. Redmond*, 518 U.S. 1 (1996), to which Hunter also cites, govern the disclosure of patient-

therapist communications after the fact, not the circumstances under which they are made.

Indeed, rather than supporting Hunter's assertion that Bell had a right to speak with Dr. Amin privately, the Act recognizes that communications between a therapist and a patient may take place in the presence of other persons. *See* 740 ILCS 110/2 (defining "communication" as including "any communication made by a recipient or other person to a therapist or to or in the presence of other persons during or in connection with providing mental health or developmental disability services to a recipient"). The Act then prohibits disclosure of such communications by anyone, not just by the therapist. 740 ILCS 110/3 ("All records and communications shall be confidential and shall not be disclosed except as provided in this Act."). In other words, under Illinois law Bell's communications with Dr. Amin were equally privileged whether they took place in the presence of a corrections officer or not.

As a pretrial detainee, Bell had a constitutional right to adequate mental health treatment. Hunter points to no evidence that suggests that Bell could not receive adequate mental health treatment in the presence of a corrections officer, and we find that he did not have the right to an examination by Dr. Amin without the corrections officer remaining in the room.[3] Therefore, the

---

[3] This is an especially easy conclusion to reach given that the purpose of the County's policy is to protect medical providers

(continued...)

policy to which Hunter points did not violate Bell's constitutional rights and the district court correctly found that there is no basis for holding the County liable under § 1983.

### B. Medical Malpractice Claims Against Dr. Amin

The district court granted summary judgment in favor of the defendants on Hunter's medical malpractice claims. Hunter appeals that ruling only with regard to Dr. Amin.

The district court, citing *Curtis v. Jaskey*, 759 N.E.2d 962, 967 (Ill. App. Ct. 2001), ruled that

> the physician-patient relationship creates a duty for the physician to provide competent medical care to the patient. A medical malpractice action is predicated on such a duty. However, where the patient expressly refuses to consent to a medical procedure, no duty

[3] (...continued)

from being attacked by offenders and a "high degree of deference" is given "to the discretion of prison administration to adopt policies and practices to maintain the safety and security of this country's penitentiaries." *Board v. Farnham*, 394 F.3d 469, 477 (7th Cir. 2005) (citations and internal quotation marks omitted). Indeed, the need for such a policy is supported by the fact that it is mandated by an Illinois regulation that applies to all county jails and provides: "When a physician or other medical personnel attends patients at the facility, a jail officer shall be present to maintain order, prevent theft of medication, equipment or supplies, and to assure an orderly process." 20 Ill. Adm. Code § 701.90(f)(2).

arises on behalf of the physician to perform the pro-
cedure. Ergo, the physician cannot be held liable
for failing to perform the duty.

That is a correct statement of Illinois law and supports
a finding that Dr. Amin cannot be held liable for failing
to conduct an examination of Bell, inasmuch as the
record is quite clear that Bell refused to consent to the
examination offered by Dr. Amin because of the
presence of the jail officer.

The problem is that Hunter's malpractice claim against
Dr. Amin is not based solely on the fact that Dr. Amin
did not conduct an examination of Bell. Rather, both
Hunter's complaint and her brief in opposition to
Dr. Amin's motion for summary judgment make clear
that she also alleges that Dr. Amin committed malpractice
by discontinuing Bell's medication. Dr. Amin argues
that he had no choice but to do so because Bell had
refused treatment. The fact is, however, that Bell did not
refuse to continue his medication; rather, he refused to
submit to a psychiatric examination by Dr. Amin. There
is no evidence to support Dr. Amin's bare assertion that
it was necessary for Bell to be examined by him in order
for his previously-prescribed medication to be con-
tinued; indeed, Dr. Amin offers no explanation of why
that would be the case. The assertion is belied by the fact
that Bell had been at the jail for over a week before
Dr. Amin's attempt to examine him and had been taking
his medication during that time. The fact that Dr. Amin
attempted to examine Bell on that particular day had
nothing to do with Bell himself; it was simply the day
that Dr. Amin was scheduled to see patients at the jail.

Further, a week earlier Dr. Amin had changed Bell's prescribed sleep aid from amitriptyline to trazodone, demonstrating that he could and did make decisions regarding Bell's medications without examining him. The decision to discontinue Bell's medication was another such decision.

Dr. Amin's deposition testimony is that he believed that Bell was experiencing a manic episode that was caused by the antidepressant he was taking. Therefore, he decided to discontinue Bell's antidepressant, which he believed would bring him down from his manic episode and allow him to conduct a psychiatric examination on his next visit. That was a treatment decision to which a duty attached. Whether the other elements of a medical malpractice claim—violation of the standard of care and proximate cause—also are present in this case remains be seen, as those issues were not raised in the district court.

### C.  Jurisdiction

There is one final issue that merits a brief discussion. We clearly have jurisdiction over this appeal, inasmuch as it includes a 42 U.S.C. § 1983 claim. However, it is not clear whether jurisdiction over Hunter's malpractice claim is dependent on the supplemental jurisdiction statute, 28 U.S.C. § 1367, or whether diversity jurisdiction is present. Hunter asserts the latter; however, neither Hunter's complaint nor her jurisdictional statement sets forth the states of citizenship of the individual parties, but rather indicates only where they reside. "[R]esidence and citizenship are not synonyms and it is the latter

that matters for purposes of diversity jurisdiction."
*Meyerson v. Harrah's East Chicago Casino*, 299 F.3d 616,
617 (7th Cir. 2002). In addition, Hunter sues both individu-
ally and as the personal representative of Bell's estate,
and "the federal diversity statute treats 'the legal rep-
resentative' of a decedent's estate (or the estate of an
infant or an incompetent) as a citizen of the same state
as the decedent." *Gustafson v. zumBrunnen*, 546 F.3d 398,
400-01 (7th Cir. 2008) (citing 28 U.S.C. § 1332(c)(2)).
No mention of Bell's state of citizenship at the time of
his death is contained in the record, although Hunter's
counsel suggested at oral argument that he was a citizen
of Missouri. Because only state law claims now remain
in this case, the district court should determine on
remand whether the requirements for diversity juris-
diction are satisfied. If they are not, the court should
then determine whether it is appropriate to continue
to exercise supplemental jurisdiction over Hunter's
malpractice claims. *See Leister v. Dovetail, Inc.*, 546 F.3d
875, 882 (7th Cir. 2008) ("When the federal claim in a
case drops out before trial, the presumption is that the
district judge will relinquish jurisdiction over any sup-
plemental claim to the state courts.").

## Conclusion

For the reasons set forth above, the judgment of the
district court is affirmed with regard to Hunter's § 1983
claim against the County. With regard to Hunter's medical
malpractice claims against Dr. Amin, the grant of sum-

mary judgment is reversed and remanded for further proceedings consistent with this opinion.

AFFIRMED in part and REVERSED and
REMANDED in part.

SYKES, *Circuit Judge,* dissenting. I agree with my colleagues that summary judgment for St. Clair County on Hunter's § 1983 claim was appropriate. I disagree, however, with the majority's decision to reinstate Hunter's medical-malpractice claim against Dr. Amin. The district court properly entered summary judgment against Hunter on that claim as well, and I would affirm the judgment in its entirety.

Under Illinois law "[t]he duty of a physician to render competent medical care arises as a consequence of the physician-patient relationship." *Curtis v. Jaskey,* 759 N.E.2d 962, 968 (Ill. App. Ct. 2001). A physician must have the patient's consent before rendering treatment. "Absent consent, whether express or implied, a physician has no right to render medical treatment to a patient." *Id.* The Illinois Supreme Court has emphasized that "a patient normally must consent to medical treatment *of any kind.*" *Keiner v. Cmty. Convalescent Ctr.* (*In re Estate of Longeway*), 549 N.E.2d 292, 297 (Ill. 1989) (emphasis added). And "because a physician must obtain consent from a patient prior to initiating medical treatment, . . . the

patient has a common law right to withhold consent and thus refuse treatment." *Id.* This "incorporates all types of medical treatment, including life-saving or life-sustaining procedures." *Id.* Accordingly, where a patient refuses consent to treatment, Illinois holds that no duty to render competent treatment arises and no action for medical malpractice may be maintained. *See Curtis,* 759 N.E.2d at 968 ("Where a patient refuses to consent to a medical procedure, no duty arises on behalf of a physician to perform that procedure such that the physician can be held liable for failing to perform it.").

My colleagues conclude that although these principles preclude liability predicated on Dr. Amin's failed attempt to conduct a psychiatric examination of Bell, the doctor nonetheless may be held liable for discontinuing Bell's medication. I disagree. As the foregoing authorities make clear, a physician's right to render medical treatment—and therefore his duty to render competent treatment—arises when a physician-patient relationship is established and depends upon the patient's consent. Prescribing medication is a form of medical treatment. Here, a physician-patient relationship was not established and therefore a right to treat did not arise because Bell refused to consent to the psychiatric examination that was a necessary predicate to Dr. Amin's treatment decisions—including the decision to prescribe medication for the treatment of Bell's then-extant psychiatric condition. Because Bell refused to consent to the examination, Dr. Amin had no right to render treatment—no right, that is, to prescribe medication. As such, there is no duty and therefore no basis for a medical-malpractice action.

To be more specific, the undisputed facts are as follows: Bell was booked into the St. Clair County Jail a week before Dr. Amin's failed attempt to examine him. When he arrived, he was taking certain prescriptions for bipolar disorder. One was Prozac, an antidepressant; another was Elavil (amitriptyline), sometimes prescribed as a sleep aid. Elavil was classified as a "concern medication" under Illinois Department of Corrections policy, and the department did not permit its use in Illinois correctional facilities. Accordingly, Dr. Amin substituted an alternative sleep aid—trazodone—and scheduled Bell for an examination the following week during his regular visit to the jail.

As my colleagues explain, at that appointment Bell became agitated at the presence of a correctional officer. He was told that the officer was required to remain in the room during the examination, and at this his agitation increased. Dr. Amin made a tentative judgment based on Bell's behavior that he was suffering a manic episode and needed a different mix of psychotropic medications. The doctor testified in his deposition that Prozac can cause mania in patients with bipolar disorder and he thought Bell should stop taking it; he also suspected Bell needed a mood stabilizer. But the doctor needed to conduct a full psychiatric examination before prescribing medications.

Dr. Amin tried to explain to Bell that he needed to conduct the examination in order to prescribe medication and that Bell's medication would be discontinued if he refused to be examined. This only angered Bell more

and he ultimately refused to be examined. He was given a "Release of Responsibility" form, which he crumpled up and threw away. Dr. Amin planned to attempt another exam the following week. But based on Bell's refusal to consent to the psychiatric examination, his prior medications were discontinued and no new ones were prescribed. Bell committed suicide before his next appointment with Dr. Amin.

My colleagues have concluded that the discontinuation of Bell's prior medications is separately actionable even though the failed psychiatric examination is not. They base this conclusion on a subsidiary one: that the psychiatric examination was not necessary for Dr. Amin to continue to prescribe the medications Bell was taking when he entered the jail. Maj. op. at 9. There is no support for this in the record. Drug-prescription decisions are medical decisions, and Hunter presented no expert medical evidence to contradict Dr. Amin's testimony that he needed a current psychiatric examination before prescribing medications.

My colleagues point to the fact that when Bell first arrived at the jail, Dr. Amin substituted trazodone for amitriptyline, Bell's previously prescribed sleep aid, and that he made this decision without examining Bell. This does not establish that the psychiatric exam was unnecessary to Dr. Amin's prescription decisions at the time he first attempted to examine Bell. It is undisputed that Dr. Amin made the drug substitution upon Bell's admission to the jail because state regulations prohibited the use of amitriptyline. That Bell was continued

on this substitute sleep aid and his other medications during his first week in the jail—before he saw Dr. Amin—does not establish that a psychiatric examination was unnecessary to the treatment decisions Dr. Amin needed to make when he first saw Bell a week later. At the time of his admission into the jail, Bell had not yet seen Dr. Amin or refused the psychiatric examination, and his continued receipt of his prior prescription medications during this interim period falls within Illinois' doctrine of implied consent. *Curtis*, 759 N.E.2d at 967-68 (consent is implied based on an existing emergency or other circumstances under which the patient's actual consent cannot be obtained).

But when actual consent to treat has been sought and refused, this doctrine falls away and the doctor has no right to treat. *Id.* at 968. Once Bell refused to consent to the psychiatric examination, Dr. Amin lacked the right to render treatment. This meant he had no right to prescribe medications—*either* those Bell had been taking *or* new medications. Because of Bell's refusal, no physician-patient relationship was established and no right or duty to treat arose. Therefore, there is no basis for medical-malpractice liability. The district court properly entered summary judgment for Dr. Amin. Accordingly, I must respectfully dissent.