In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-3052

JAIRO E. RAMOS,

*Plaintiff-Appellant,*

*v.*

GARY HAMBLIN, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 1:13-cv-00044-WCG — **William C. Griesbach**, *Chief Judge.*

ARGUED SEPTEMBER 9, 2016 — DECIDED OCTOBER 24, 2016

Before POSNER, MANION, and WILLIAMS, *Circuit Judges.*

POSNER, *Circuit Judge.* The plaintiff, who is appealing the dismissal, resulting from the judge's grant of the defendants' motion for summary judgment, of the plaintiff's suit under 42 U.S.C. § 1983 alleging punishment that violated the Eighth Amendment, was at the time relevant to this suit a prisoner at Stanley Correctional Institution, a Wisconsin medium-security prison, serving a long prison term for homicide. In the fourteenth year of his imprisonment (though on-

ly his fifth year at Stanley), he was placed in a cell with a prisoner in his second year at Stanley named DaSilva, who one night twelve days later sexually assaulted the plaintiff in the cell. DaSilva was in prison for having sexually assaulted a woman. Both prisoners were classified as "medium security" inmates, meaning that they were believed to be less likely to engage in violent or otherwise disruptive behavior than maximum-security inmates, though DaSilva in his two years at Stanley had committed eight violations of the prison's rules, including fighting, lying, theft, and use of intoxicants—but no sexual offenses.

The plaintiff promptly reported DaSilva's sexual assault of him to a correctional officer, who notified her superiors, who conducted a thorough investigation that resulted in a criminal charge being lodged against DaSilva, also a disciplinary charge against him for disobeying prison regulations regarding sexual assault, and finally an official notice that the plaintiff and DaSilva were not to share a cell.

The complaint charges the defendants, who are supervisory personnel at Stanley, including its warden, with deliberate indifference to the danger of the plaintiff's being sexually assaulted by DaSilva. All prisoners at Stanley have a cellmate, randomly assigned in the first instance, and the plaintiff claims that the defendants were aware of, but did nothing to eliminate, the danger of placing DaSilva in the same cell with him. Not only had DaSilva committed a previous sexual assault, albeit against a woman, but in addition the plaintiff claims to have been perceived as homosexual, which may have made him more likely to be assaulted, sexually or otherwise. More broadly the plaintiff attacks the practice of random assignment of cellmates. Presumably his

previous cellmate had been transferred to a different cell (or different prison, or had completed his prison term and been released), leaving a gap that the prison filled with a random assignment, namely of DaSilva.

A 2003 federal statute, the Prison Rape Elimination Act, 42 U.S.C. §§ 15601–15609, as the name implies, and corresponding rules of the Wisconsin Department of Corrections, Executive Directives 16A and 72, make the prevention of prison rape a priority concern of prison administrators, just as the prevention of suicide by newly jailed persons is a priority concern of jail administrators. See, e.g., *Belbachir v. County of McHenry*, 726 F.3d 975, 980–82 (7th Cir. 2013). Thus each new inmate in a Wisconsin prison is given a "Sexual Abuse/Assault Prevention and Intervention" handbook, which among other things directs him to inform prison staff about any danger he perceives of being assaulted or otherwise abused. The handbook states:

> You should feel free to discuss your concerns about sexual misconduct with any staff member. Some staff, like psychologists, are specially trained to help you deal with problems in this area. If you are in an emergency situation, approach any staff member. … Even if you have not been assaulted or abused, but are in fear for your safety, you should report your concern to staff.

The plaintiff claims that he was perceived by inmates and staff alike as homosexual, and that this perception should have alerted the staff to the need to separate him from his new cellmate, a convicted rapist. The record indicates that Ramos may have been homosexual or bisexual but renounced that identity upon a religious conversion. Yet the principal evidence that he was perceived as being homosex-

ual was that prison staff had asked him whether he was, but there is no indication that they told any other prisoner that he was homosexual. It made sense for the staff to question Ramos about his sexual orientation, given the vulnerability of homosexual prisoners to rape by other prisoners, whether homosexual prisoners or heterosexual ones seeking to substitute homosexual sex in a setting in which heterosexual sex is precluded—to engage, in other words, in what is called "opportunistic homosexuality." See National Center for Transgender Equality *et al.*, "Preventing the Sexual Abuse of Lesbian, Gay, Bisexual, Transgender, and Intersex People in Correctional        Settings"     3–6     (May      10,     2010), www.prearesourcecenter.org/sites/default/files/library/8-pre ventingthesexualabuseoflgbtipeopleincorrectionalsettings_0. pdf (visited October 21, 2016).

There is nothing to indicate that when asked by staff whether he was homosexual the plaintiff said he was, or expressed any concern about being vulnerable to sexual assault; and in these circumstances the staff would have been opening themselves to suit had they declared him a homosexual and taken action as a result, though had they believed him to be perceived by other prisoners to be homosexual it might have been wise to take steps to protect him from the likes of a DaSilva. See Jody Marksamer & Harper Jean Tobin, National Center for Transgender Equality, "Standing with LGBT Prisoners," www.transequality.org/sites/default/files/ docs/resources/JailPrisons_Resource_FINAL.pdf (also visited October 21, 2016). But so far as appears, the staff was unaware that the plaintiff was perceived by other prisoners to be homosexual; nor is there any evidence of such a perception, apart from the plaintiff's unsupported claim.

It's not clear how vulnerable the plaintiff was to a sexual assault. It's true that he isn't tall—he's 5′6″ (DaSilva is 5′10″); but neither is he a mouse, for he had been, after all, convicted of reckless homicide. And there is no indication that he had any anxieties about DaSilva before the rape. Nor had DaSilva committed any sexual offenses in prison, and as far as appears he had told no one—including the plaintiff—that he had raped anyone, let alone that he wanted and was planning to rape an inmate.

In these circumstances we can't see how the defendants, who as supervisory employees of the prison would have limited interactions with inmates, can be thought to have been deliberately indifferent to the possibility that the plaintiff would be raped—that is, would know there was a nontrivial danger of that happening, could prevent it without danger or other undue cost to themselves, but instead decided to do nothing.

Had the plaintiff any fear of DaSilva, it behooved him to ask the prison staff to transfer him to another cell. If he either is a homosexual or, as he contends, felt vulnerable because he was believed by prison staff and prisoners to be one, it behooved him to complain to prison staff, consistently with the advice in the prison handbook. He didn't do that. He argues that random assignment of cellmates is deliberate indifference per se to prisoners' safety. But the only alternative he suggests (for he does not argue that all prison inmates should be in solitary confinement or even that he should have been) is that sex offenders never be placed in cells with any inmate who for whatever reason is at a heightened risk of being sexually assaulted. Given the number of characteristics that could trigger such a heightened

risk, sex offenders would probably have to be either placed in solitary confinement or given cellmates who were also sex offenders. The feasibility of such a solution can be questioned; but more important is the fact that the plaintiff presents no evidence that it would promote prison safety more than the handbook, which emphasizes a prisoner's right to complain about danger posed to him by a cellmate. Apropos is our comment in *Billman v. Indiana Dept. of Corrections*, 56 F.3d 785, 788 (7th Cir. 1995), that if prison staff "place a prisoner in a cell that has a cobra, but they do not know that there is a cobra there (or even that there is a high probability that there is a cobra there), they are not guilty of deliberate indifference even if they should have known about the risk, that is, even if they were negligent—even grossly negligent or even reckless in the tort sense—in failing to know." We can't even say that administrators of the Stanley Correctional Institution were negligent or reckless in erecting this policy. The line officers who assigned Ramos and DaSilva to the same cell may have been negligent or reckless, but he hasn't sued them—just the administrators.

In short, the plaintiff has no case, and so his suit was rightly dismissed by the district court.

AFFIRMED