In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-3024

VERTULIE LAPRE, Administrator of the
Estate of Okoi Ofem,

*Plaintiff-Appellant*,

*v.*

CITY OF CHICAGO,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cv-03199 — **Virginia M. Kendall**, *Judge.*

ARGUED SEPTEMBER 12, 2018 — DECIDED DECEMBER 17, 2018

Before EASTERBROOK, ROVNER, and HAMILTON, *Circuit Judges*.

ROVNER, *Circuit Judge.* Okoi Ofem committed suicide in a jail cell at a City of Chicago lockup. His mother, Vertulie Lapre, sued the City under 42 U.S.C. § 1983, for failing to prevent her son's death. Because Lapre lacks evidence that the City was

deliberately indifferent to the risk of suicide for detainees held in City lockups and also cannot show that the City's policies and practices were the cause of Ofem's death, we affirm the district court's grant of summary judgment in favor of the City.

## I.

Chicago police officers arrested eighteen-year-old Okoi Ofem on a misdemeanor assault charge on September 12, 2013, and took him to the City's 4th District Police Station. After processing, Ofem arrived at the 4th District Lockup ("Lockup") at approximately 3:30 p.m., roughly two hours after his arrest. A Chicago police officer and two detention aides were on duty at the Lockup. Pursuant to City policy, detention aide William Zaremba conducted a visual inspection of Ofem and asked him a series of screening questions, marking his responses on a processing report. From the visual inspection, Zaremba noted on the report that Ofem displayed no signs of pain, injury, or infection; he did not appear to be under the influence of drugs or alcohol or showing signs of withdrawal; he did not seem to be despondent or irrational, and was not carrying medication. Zaremba recorded a "No" in response to every screening question, including whether Ofem was taking any medication, whether this was his first arrest, whether he had ever attempted suicide or serious harm, whether he had serious medical or mental problems, whether he was receiving any treatment, and whether he was "transgender/intersex/gender non-conforming." Ofem refused to list an emergency contact, and appeared to be "miffed" or angry about the charge, but did not appear depressed. Zaremba took Ofem's shoelaces, belt and keys and placed him in a one-person cell. Ofem declined all offers of food that day.

The next morning, one of the assigned detention aides for the Lockup did not show up to work. At 6 a.m., Officer James Carrillo was assigned to take the place of the missing aide. Carrillo's regular assignment was that of paper review officer. He had received no specific training as a lockup keeper but he occasionally filled in when the need arose. Another assigned aide, Dennis Graham, began the shift but left at approximately 8 a.m. to attend a meeting. Early that morning, Ofem was taken to the criminal court. Ofem arrived back at the Lockup at 10 a.m., an unexpected and unusually early return. During the ride back to the Lockup, Ofem did not inform the transport officers that he was suicidal or contemplating self-harm. Carrillo received Ofem back into the Lockup, and was the only person on duty at that time. Ofem appeared surprised and confused about what had happened at court, and asked Carrillo what was happening. Carrillo replied that Ofem had likely been sent to the wrong court—one that handled felony charges—and that he would have to go instead to another court that handled misdemeanor charges. Carrillo thought that Ofem appeared tired and Ofem again declined all offers of food. Ofem did not inform Carrillo or any other officer that he was contemplating suicide or self-harm. He was again placed in a one-person cell, and there were no other detainees in the Lockup at that time.

Between his 10:00 a.m. return and 1:00 p.m., someone at the jail visually inspected Ofem every fifteen minutes, sometimes in person and sometimes via a poor-quality video monitor. The District Station Supervisor also conducted a walk-through at 11:30 a.m. At 12:45 p.m., Carrillo and detention aide Graham (who had apparently returned from his meeting) checked on

Ofem in person. At 1:00 p.m., Carrillo checked on Ofem through the video monitor and did not notice anything amiss. At 1:10 p.m., Carrillo glanced at the video monitor and saw Ofem hanging from a horizontal bar in his cell. Carrillo and Graham immediately went to the cell, which was approximately fifteen feet away on the other side of a door, and saw that Ofem had used his jeans to hang himself. He had tied the jeans to the cell in such a way that the officers had difficulty opening the cell door. Graham used a pocket knife to cut through the jeans and Carrillo forced the door open. At the same time, Officer James Mangan ran to call for medical assistance. Once they removed the pants from Ofem's neck, he let out a groan. Carrillo attempted to rouse Ofem by calling to him, slapping him and shaking him. When Ofem did not respond, Carrillo administered chest compressions. Paramedics arrived and took over from Carrillo. Ofem was transported to a hospital where he died the following day.

At the time of Ofem's incarceration and death, City lockup facilities operated under "Special Order S06-01-02," a directive from the Superintendent of Police outlining the responsibilities of lockup personnel "to ensure arrestees are properly processed, booked, and safeguarded." R. 120–25 (hereafter "Special Order"). The Special Order specified, in relevant part, that lockup personnel will:

> 7.  prior to accepting any arrestee, conduct an initial inspection of the subject following the Guidelines

for Arrestee Screening and Monitoring chart (CPD-11.523).[1]

8. if screening process indicates that the arrestee is perceived to be mentally/chemically impaired or suicidal, the station supervisor will be notified immediately.

9. not accept any arrestee into the lockup who has injuries or illnesses that may require hospitalization or the immediate attention of a healthcare professional.

---

[1] The Guidelines for Arrestee Screening and Monitoring is a color chart that, under City policy, is to be posted in the arrestee processing area of each facility, among other places. It contains four columns for evaluating arrestees: "SICK/INJURED/EMOTIONAL RISK;" "INTOXICATED/ IMPAIRED/PREGNANT;" "INFECTION/COMMUNICABLE DISEASES;" and "NO SIGNS OF DISTRESS." Under the first column, a section titled, "Is arrestee suicidal?" lists warning signs: "Express Desire or Intent to Harm Self or Others;" "Actual Self Harm/Suicide Attempt;" "Hyperactive/Extremely Agitated;" and "Intense Guilt/Remorse." Another section of the same column advises officers to assess whether the arrestee is irrational or delusional, cannot follow simple commands, is disoriented or hallucinating, or is unaware of his or her surroundings. For all parts of the first column, affirmative answers require notifying the District Station Supervisor and sending the arrestee to the nearest approved hospital or mental health intake facility. Although there are multiple references to this chart in the record, the chart itself does not appear to be part of the record, and so we provide this information for background purposes only. A version last revised in May 2013 can be accessed through https://home. chicagopolice.org/inside-the-cpd/department-directives-system/ (last visited December 4, 2018).

13. complete the intake screening questions process following the Guidelines for Arrestee Screening and Monitoring chart.

15. in those instances in which an arrestee responds "yes" to the arrestee questions of "attempted suicide/serious harm," check the corresponding box in the Additional Lockup Demographics/Cautionary Descriptors field.

16. in those instances during the visual check of the arrestee they determine/categorize the arrestee to be despondent, check the corresponding box in the Additional Lockup Demographic/Cautionary Descriptors field.

18. in those instances in which the subject arrestee has been identified as a present or prior danger to themselves (i.e. attempt suicide, caused harm to self, despondent), place the subject in a cell closest to the lockup keeper and will place another arrestee in the cell with the subject arrestee.

23. complete a visual check of each arrestee **every 15 minutes** following the Guidelines for Arrestee Screening and Monitoring chart and record the time of each inspection, a concise statement of conditions found, notable occurrences, actions take[n], if any, and the initials and employee identification number on the Inspection Log.

R.120–25 (emphasis in original). The Special Order also requires the Station Supervisor to inspect the lockup and the

arrestees at the start of his or her tour, and, at a minimum, conduct at least four thorough inspections of the lockup and the arrestees per tour. Station Supervisors are also charged with immediately evaluating any arrestees who exhibit signs of being mentally or chemically impaired or suicidal, and taking appropriate action. R. 120–25. The State of Illinois also enacted jail and lockup standards ("Illinois Lockup Standards") that were in effect at the time of Ofem's death, including requirements to personally inspect detainees at least every thirty minutes.

Vertulie Lapre, Ofem's mother and the administrator of his estate, sued the City and several individual officers and detention aides pursuant to 42 U.S.C. § 1983, alleging that the City and these individuals were responsible for Ofem's death in custody. The claims against the individuals were dismissed with prejudice and the City sought summary judgment on the only claim remaining, Count III of the First Amended Complaint. That count alleged that the City was liable for Ofem's death under *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978), because the City's policies, practices and customs led to Ofem's death.

Lapre originally asserted twelve policies (we will use "policies" as shorthand for "policies, practices and customs") or gaps in policies as leading to Ofem's death, but at the summary judgment stage, the parties and the district court focused on five specific policies or gaps. The district court granted summary judgment in favor of the City, largely because Lapre failed to present evidence of constitutionally inadequate City-wide policies and because she could not

demonstrate that the City's policies caused a deprivation of Ofem's federal rights. Lapre appeals.

## II.

On appeal, Lapre contends that the City's policies regarding detainees were deliberately indifferent to the risk of suicide and were the "moving force" behind Ofem's suicide. She faults the City for not implementing policy changes that the City knew would prevent suicides, and would have prevented Ofem's suicide. She contends that the district court improperly ignored disputed facts and inappropriately resolved certain fact disputes in favor of the defendants, viewing the evidence in a light most favorable to the City. We review the district court's grant of summary judgment *de novo*, examining the record in the light most favorable to Lapre and construing all reasonable inferences from the evidence in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Yahnke v. Kane County, Ill.*, 823 F.3d 1066, 1070 (7th Cir. 2016). Summary judgment is appropriate when there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Anderson*, 477 U.S. at 256; *Yahnke*, 823 F.3d at 1070. We may affirm summary judgment on any basis we find in the record. *Nature Conservancy v. Wilder Corp. of Delaware*, 656 F.3d 646, 653 (7th Cir. 2011).

A plaintiff seeking to impose liability on a municipality under section 1983 must identify a municipal policy or custom that caused the plaintiff's injury. *Board of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 403 (1997).

> Locating a "policy" ensures that a municipality
> is held liable only for those deprivations result-

> ing from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.

*Brown*, 520 U.S. at 403–04 (citations omitted). The plaintiff must not only identify conduct properly attributable to the municipality but must also demonstrate that, "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404. *See also Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000) (where the municipal policy is itself unconstitutional, the constitutional injury can be said to have been directly caused by the municipality; indirect liability may be proved by demonstrating a series of bad acts that allow an inference that the policymaking level of government was aware of the problem and, by failing to do anything to remedy it, adopted the misconduct of subordinates). Finally:

> a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with "deliberate indifference"

as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice.

*Brown*, 520 U.S. at 407 (citation omitted).

In certain circumstances, municipal liability may also be established by a policy gap, by a city's failure to have procedures in place for addressing a known risk of serious harm. Suicide is a known risk in the custody setting, and occurs at higher rates than in non-custodial settings. *Boncher ex rel. Boncher v. Brown Cty.*, 272 F.3d 484, 486 (7th Cir. 2001). For that reason, we have remarked that "[j]ail managers who decided to take no precautions against the possibility of inmate suicide—to have no policy, for example no suicide-watch option—would be guilty of deliberate indifference in the relevant sense; they would be ignoring a known and serious risk of death of persons under their control for whose safety they are responsible." *Boncher*, 272 F.3d at 486 (citations omitted). But when a policy is in place, the standards detailed above apply.

On appeal, Lapre identifies five municipal policies that she asserts evidenced the City's deliberate indifference towards the risks of suicide and that were the moving force behind Ofem's death: "1) the policy decision to not remove horizontal bars from the 4th District; 2) the practice of not providing first aid to hanging victims by not training lockup personnel and not installing suicide kits; 3) the policy of not reassessing returnees; 4) the policy and custom of not personally inspecting detainees and leaving them isolated; and 5) the failure to properly train personnel on detecting mental health issues and potential

suicide subjects." Plaintiff-Appellant's Brief, at 18. For each of these policies, she argues that the district court improperly construed the facts in favor of the defendant or ignored evidence that she presented. Because our review is *de novo*, we need not address whether the district court erred on evidentiary matters. We will independently review the record evidence on which Lapre relies.

**A.**

We begin with the presence of horizontal bars at the 4th District Lockup. The City is, in fact, aware of the risk posed by horizontal bars in lockup cells, and this very issue has been litigated previously. *See Frake v. City of Chicago*, 210 F.3d 779, 781–82 (7th Cir. 2000). Like Ofem, Frake hanged himself from the horizontal bars of his City lockup cell using an item of clothing that he had been allowed to keep. Frake's father sued the City under section 1983 for deliberate indifference to the risk of suicide posed by the horizontal bars. At the time of Frake's death, City policies were similar to those in place under the Special Order that controlled at the time of Ofem's death. Lockup personnel were required to visually assess arriving detainees for signs of pain, injury, drug or alcohol intoxication, despondency and the need for medication. They also questioned detainees about medical and mental health issues and whether the detainee had ever attempted suicide. As is currently required, lockup personnel also confiscated belts, shoelaces, ties and other items that a person could use for self-harm. At the time of Frake's death, the jailers checked the cells every fifteen minutes and the watch commander and desk sergeant were required to inspect the lockup twice per tour of

duty. Training was provided to officers for suicide awareness. 210 F.3d at 781.

We noted in *Frake* that a finding of deliberate indifference required a showing that officials were aware of a substantial risk of serious injury to detainees but nevertheless failed to take appropriate steps to protect detainees from that known danger. 210 F.3d at 782. Jailers are not required to guarantee the safety of detainees, and the "existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent." *Id*. We rejected the plaintiff's contention that the number of suicides and attempts alone could demonstrate deliberate indifference but we also declined to endorse the City's argument that the relatively low rate of suicides compared to the number of arrests proved it could not be held liable. We declined to consider the risks of the horizontal bars in isolation, instead weighing the additional precautions taken to reduce the risk of suicide. In light of the City's other safeguards, we found that continued use of cells with horizontal bars did not meet the standard for deliberate indifference. 210 F.3d at 782.

Lapre cites *Frake* as evidence that the City has been well aware of the risks posed by horizontal bars for twenty years. She contends that, since *Frake,* the City does not use horizontal bars when building new lockup facilities. She notes anecdotal evidence from personnel at the 4th District regarding the prevalence of continued attempted and completed suicides. She also cites statistical evidence of the rates of suicides per detainee, asserting that the rate has actually increased substantially since *Frake*. All of this, she asserts, demonstrates that the

continued presence of horizontal bars exhibits deliberate indifference.

Lapre's proposed statistical evidence suffers serious flaws. She co-mingles suicides and suicide attempts and appears to have no reliable information supporting her contention that the rate of suicides has increased in the last twenty years. Nor does she provide the metric that we have held is the most relevant when assessing government responsibility for suicide risk:

> It is not the number of suicides that is a meaningful index of suicide risk and therefore of governmental responsibility, … but the suicide rate; … and it is not even the rate by itself, but rather the rate relative to the "background" suicide rate in the relevant free population (the population of the area from which the jail draws its inmates) and to the rate in other jails.

*Boncher*, 272 F.3d at 486–87. There is no basis on this record to conclude that there are more suicides in City lockups now than there were at the time of *Frake*, or that these are disproportionate to the suicide rate in the relevant free population. *See also Pittman v. County of Madison, Ill.*, 746 F.3d 766, 780 (7th Cir. 2014) (the bare fact that other inmates attempted or committed suicide does not demonstrate that a jail's policies were inadequate, that officials were aware of any suicide risk posed by the policies or that officials failed to take appropriate steps to protect the inmate). She also provides no evidence regarding the rate of suicides in lockups that still have horizontal bars versus the rate in the new lockups that are constructed without horizontal bars.

Nor does Lapre acknowledge the other precautionary measures that the City took to prevent the known risk of suicide in its facilities. As we noted above, at the time of Ofem's death, the City had in place policies that exceeded those in effect at the time of Frake's death. In addition, the City's efforts to replace old lockup facilities with new ones that do not employ horizontal bars is not evidence of deliberate indifference but of deliberate efforts to remedy the situation. That the City might have proceeded more quickly does not mean that it was deliberately indifferent to the risk. *Pittman*, 746 F.3d at 780 (possibility of better policies does not necessarily mean the defendant was deliberately indifferent); *Frake*, 210 F.3d at 782 (same). Finally we note that Lapre's anecdotal evidence of events in the 4th District is insufficient to demonstrate a City-wide "practice [that] is so widespread as to have the force of law." *Brown*, 520 U.S. at 403–04. Taken as a whole, the measures in place and the changes being made by the City do not demonstrate deliberate indifference under *Frake* for the City's continued use of cells with horizontal bars. *See also Estate of Novack*, 226 F.3d at 531 (finding no liability for an inmate suicide where the plaintiff failed to show a pattern of suicide at the jail from which the finder of fact could draw an inference that the county was aware that its policies for treating mentally ill inmates at risk for suicide were inadequate and chose to do nothing in the face of this knowledge).

**B.**

We turn to Lapre's assertion that the City has a practice of not providing first aid to hanging victims by not training lockup personnel and not installing "suicide kits." She contends that a jury must decide whether the failure to provide

proper first aid in the first few minutes after discovering Ofem in distress was a proximate cause of his death. Although Lapre does not specify the contents of the suicide kits, it is apparent from her argument that such kits would at least include a device for cutting down a person who is hanging, and a device to enable lockup personnel to engage in mouth-to-mouth resuscitation. Lapre asserts that the absence of a suicide kit caused a delay in cutting Ofem down from the bar, and that the aid delivered thereafter was disjointed and ineffective.

The City did not provide first aid training to lockup personnel prior to 2012, and the officers present on the day of Ofem's death were arguably not trained regarding when and how to perform CPR. Graham testified that he cut Ofem down in a matter of seconds using a pocket knife that he carries with him. Carrillo called out to Ofem, slapped and shook him, and then delivered chest compressions when Ofem did not respond. At the same time, another officer called for emergency responders, who arrived and took over the chest compressions from Carrillo. We need not decide whether Lapre has presented sufficient evidence to demonstrate that this care was inadequate or inappropriate because she has presented no evidence that the absence of a suicide kit or a lack of training for lockup personnel proximately caused Ofem's death.[2]

---

[2]   The American Heart Association provides science-based CPR guidelines. For healthcare providers and trained persons, the AHA recommends conventional CPR, which consists of repeated cycles of thirty chest compressions and two mouth-to-mouth breaths. For the general public or bystanders, the AHA recommends hands-only CPR, which consists of chest

(continued...)

On appeal, Lapre concedes that she did not present evidence related to causation on this claim, but asserts that the City did not mention causation when it moved for summary judgment. Because she was not on notice that causation would be an issue, she argues that she did not have an opportunity to present facts from the medical examiner and from her expert regarding causation. But the City did in fact argue in its opening brief on summary judgment that Lapre provided no evidence that any of the alleged City policies caused a constitutional deprivation. R. 119, at 13–14. The City repeated the point in its reply brief. R. 131, at 9–10. Lapre was therefore on notice that causation was at issue.

Moreover, to recover from a municipality under section 1983, a plaintiff must demonstrate that, "through its deliberate

---

[2] (...continued)

compressions only. *See* https://cpr.heart.org/AHAECC/CPRAnd ECC/AboutCPRECC/WhatIsCPR/UCM_499896_What-is-CPR.jsp (last visited Nov. 30, 2018). The Mayo Clinic additionally recommends that before beginning CPR, if the person appears unconscious, the person rendering aid should tap or shake his or her shoulder and ask loudly, "Are you OK?" If the person does not respond, the person rendering aid should call for emergency services and then begin chest compressions only. *See* https://www.mayoclinic.org/first-aid/first-aid-cpr/basics/art-20056600 (last visited Nov. 30, 2018). Neither site mentions the use of a device to aid mouth-to-mouth respiration. The American Red Cross sells such devices in order to protect the person rendering aid from disease transmission. *See* https://www.redcross.org/store/cpr-keychain-with-face-shield-and-glove s/ARC-CPR-03.html?#start=2&cgid=cpr-keychains&viewratings=true (last visited Nov. 30, 2018). Although it is not necessary for us to decide the issue of whether the care provided to Ofem was appropriate, it appears to have conformed largely to guidelines provided by reputable organizations.

conduct, the municipality was the 'moving force' behind the injury alleged," showing "a direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404. A plaintiff opposing summary judgment must identify "admissible evidence that would permit the trier of fact to make a finding in the non-movant's favor as to any issue as to which it bears the burden of proof." *Packer v. Trustees of Ind. Univ. Sch. of Medicine*, 800 F.3d 843, 847 (7th Cir. 2015). Because Lapre admittedly presented no evidence on causation, the district court correctly rejected this claim.

## C.

Lapre next contends that the City had a policy of not reassessing detainees who were returning to the Lockup after an absence. According to Lapre, the Special Order does not require lockup personnel to reassess detainees via the mental health questionnaire, Ofem was not reassessed when he returned from court, Carrillo was not trained to reassess detainees, and none of the deposed City personnel were aware that reassessment was required. She argues that, if Carrillo had reassessed Ofem, it is likely that the assessment would have provided information that prompted further inquiry into Ofem's state of mind. As such, she asserts that the failure to reassess was a cause in fact of Ofem's death.

The Special Order is arguably ambiguous on the issue of whether a detainee will be reassessed via the intake screening questions on return to the lockup following an absence. Construing the Special Order in Lapre's favor, we will assume that the Special Order requires personnel to employ the intake questions only when a detainee first arrives at a lockup. The

Special Order does, however, require some assessment of a detainee's mental health every fifteen minutes during the visual check. At that time, lockup personnel are directed to follow the Guidelines for Arrestee Screening and Monitoring chart. The warning signs listed on the chart include whether the detainee expresses a desire to harm himself, engages in actual self-harm, is hyperactive or extremely agitated, or is feeling intense guilt or remorse. That said, it seems highly unlikely that a visual check through a grainy video feed would reveal whether an arrestee is suicidal under the standards provided in the chart.

But even if we assume that the City had a policy of assessing detainees only on initial entry to the lockup, Lapre's evidence falls short of demonstrating that the City's facially lawful policy was deliberately indifferent to a known or obvious consequence of the policy. *Brown*, 520 U.S. at 407. Lapre has presented no evidence that the policy itself led to additional suicides or that suicides would have been prevented by a different policy. Nor has she shown that the City was aware that this policy was leading to an increase in detainee suicides, for example, and yet persisted in continuing the practice. *See Brown*, 520 U.S. at 406–07. *See also Connick v. Thompson*, 563 U.S. 51, 61–62 (2011) (deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action). In *Connick*, the Court held that "when City policymakers are on actual or constructive notice that a particular omission in their training program causes City employees to violate citizens' constitutional rights, the City may be deemed deliberately indifferent if the policymakers

choose to retain that program." 563 U.S. at 61–62. Because Lapre has presented no evidence that the City was on actual or constructive notice that its policy to fully assess mental health only on first admission to the lockup was leading to constitutional deprivations, we cannot say that the City acted with the requisite level of fault for a finding of deliberate indifference. Moreover, Lapre has presented little more than speculation in support of causation on this claim, asserting without evidence that a full reassessment would have led to further inquiry which would have presumably led to an intervention that saved Ofem.

**D.**

Lapre next asserts that the City was deliberately indifferent to the risk of detainee suicide through its policy of not personally inspecting detainees and leaving them isolated. Instead, the City conducted at least some of the visual inspections through a grainy video feed even though the Illinois Lockup Standards require in-person checks at least every half hour. Lapre asserts that failing to follow the Illinois standards is evidence of deliberate indifference. She also contends that a reasonable inference may be drawn from the record that Ofem was left completely alone and isolated from his return to the jail at 10 a.m. until his suicide a little more than three hours later. Such isolation was the moving force behind Ofem's suicide, she argues.

We begin with the only evidence in the record regarding in-person inspections and interactions. When Ofem returned unexpectedly from court, he was the only person in the Lockup. He spoke with Carrillo on his return at 10 a.m.

regarding the court mixup. Carrillo also asked Ofem if he wanted something to eat, and Ofem declined. Ofem accepted Carrillo's offer of a phone call, and the call lasted a few minutes. Although Ofem was placed in the cell closest to Carrillo's work station, only fifteen or twenty feet away, there was a closed steel door separating them. Carrillo testified that either he, an unnamed fellow officer, or the Station Supervisor personally checked on Ofem every fifteen minutes from 10 a.m. to 12:45 p.m. On two or three occasions, Carrillo asked Ofem if he wanted something to eat, and Ofem declined each time. On one occasion when the other officer checked on Ofem, that officer asked Carrillo to come in to discuss the court mixup again. At 11:30, the Station Supervisor checked the Lockup in person. At 12:45, Carrillo and Graham jointly conducted an in-person check on Ofem. Carrillo noticed nothing unusual at any of these inspections. When Carrillo was getting ready to check Ofem at 1:00 p.m., he was busy responding to a request from another officer, and so Carrillo checked on Ofem through the video monitor instead of conducting an in-person check. At 1:10 p.m., Carrillo and Graham discovered Ofem hanging from the bars of his cell, less than a half hour after the final in-person check.

Lapre faults the district court for crediting Carrillo's testimony that someone inspected Ofem in person every fifteen minutes (except at 1:00 p.m., when Carrillo testified that he viewed Ofem via the video feed), arguing that a jury could disbelieve Carrillo's testimony. But Lapre herself concedes, consistent with Carrillo's testimony, that Carrillo offered food to Ofem multiple times between 10 a.m. and the time of his death, and that Ofem refused to eat each time. So Lapre admits

that Carrillo made at least several in-person visits to Ofem's cell. Moreover, although the "movant has the burden of showing that there is no genuine issue of fact, … the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Anderson*, 477 U.S. at 256. Lapre's assertions that a jury could disbelieve Carrillo are not sufficient to establish that Ofem was left alone for the three hours preceding his death. "When the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984). If we disregard Carrillo's testimony, the record still shows that Carrillo spoke to Ofem approximately three times after he returned from court and before his death less than three hours later. No fair inference may be drawn that Ofem was completely isolated because Lapre concedes that Carrillo offered Ofem food multiple times. We are left then with the City's policy of visually inspecting detainees every fifteen minutes, a policy which does not expressly require an in-person check. The City's policy additionally requires the Station Supervisor to conduct thorough inspections of the Lockup and the detainees at the start of each tour and at least four times per tour. And there is some evidence that Carrillo personally checked Ofem several times during the last three hours of his life.

Lapre has offered no evidence of any particular widespread practice regarding the visual inspections, and so we do not know whether detainees in general were left isolated for extended periods of time, whether they were inspected in

person every fifteen minutes or whether there was a combination of in-person and video checks. Moreover, Lapre presents no evidence that the City, as a matter of wide-spread custom or practice, failed to follow the Illinois Lockup Standard of conducting an in-person inspection every half hour. In any case, a violation of a state law would not necessarily demonstrate a denial of due process, and compliance with state law is not an automatic defense because state law might not comport with constitutional standards. *Boncher*, 272 F.3d at 487. *See also Estate of Novack*, 226 F.3d at 532–33 (section 1983 provides no remedy for failure to meet state law requirements). We have only anecdotal evidence regarding what happened in the 4th District on the day of Ofem's death. That evidence does not support Lapre's contention that Ofem was isolated or that the City's general practice was to isolate detainees.

Lapre also failed to offer evidence that in-person inspections of any particular frequency would affect the suicide risk for detainees or that the City was aware that more frequent in-person visits would make a difference. Her evidence that the City had contemplated installing computer card readers at the back of each lockup so that the visits could be recorded electronically adds nothing to the analysis because there is no evidence regarding why the City was considering adopting this procedure. Without evidence of either a wide-spread practice, knowledge of a risk created by a practice, or causation, the claim was properly rejected.

**E.**

Lapre's final claim regards the failure to properly train personnel on detecting mental health issues and identifying persons who are suicidal. Under *City of Canton, Ohio v. Harris*, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." 489 U.S. 378, 388 (1989).

> In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the City, for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says

> little about the training program or the legal
> basis for holding the City liable.
>
> Moreover, for liability to attach in this circum-
> stance the identified deficiency in a city's train-
> ing program must be closely related to the ulti-
> mate injury. Thus in the case at hand, respondent
> must still prove that the deficiency in training
> actually caused the police officers' indifference to
> her medical needs. Would the injury have been
> avoided had the employee been trained under a
> program that was not deficient in the identified
> respect?

*Harris*, 489 U.S. at 390–91 (citations and footnote omitted).

As we noted above, the City's Special Order and the Guidelines for Arrestee Screening and Monitoring both provided standards for determining whether a person is suffering from mental illness or heightened suicide risk. The City also provided extensive training records for each person who interacted with Ofem on the day of his death, indicating course titles and whether the employee passed or failed the course. Lapre's only evidence regarding City training policies is anecdotal evidence of the training provided to the 4th District personnel who monitored Ofem during his time in the Lockup. Those officers did not recall specific training programs or the dates of any training that they were given on identifying mental health issues or suicide risk. Although Lapre asserts both that the City failed entirely to train its officers and that the training provided was inadequate, Lapre has presented no evidence regarding **City-wide** policies or practices regarding

training. She does not point, for example, to evidence that the City has no training program or that the program the City employs has faults. Even if we disregard the City's evidence, Lapre has produced no evidence regarding the City's training practices from which we may infer deliberate indifference. That there may have been lapses in training in the 4th District is not sufficient to allow an inference of deliberate indifference by the City as a matter of policy or wide-spread practice.

Finally, Lapre also fails to show causation on her training claim. She has provided no evidence that the City's training program led to Ofem's death, or that the City's program ignored a recurring problem. She has provided nothing more than speculation regarding whether better trained officers would have responded differently, or that a different outcome was possible based on better training. In the absence of this key evidence, summary judgment in favor of the City was appropriate.

## III.

The suicide of a teenager in a City lockup is an unmitigated tragedy. The question is whether that death occurred as a result of deliberate indifference by the City through its policies, practices or customs. Lapre focused her discovery on the narrow circumstances of Ofem's death rather than on the City's official policies or unofficial but wide-spread practices or customs. As a result, she was unable to provide evidence that the City failed to adequately address the known consequences of its official or unofficial practices in the lockups. Nor did she provide evidence that any policy or policy gap was the

moving force in Ofem's death. The judgment in favor of the City is therefore

AFFIRMED.