In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-2291

ZACHARY PULERA,

*Plaintiff-Appellant,*

*v.*

VICTORIA SARZANT, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:15-cv-00461-WCG — **William C. Griesbach**, *Judge*.

ARGUED JUNE 10, 2020 — DECIDED JULY 15, 2020

Before FLAUM, BARRETT, and ST. EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. Police arrested Zachary Pulera on suspicion of bail jumping and brought him to the Kenosha County Pre-Trial Facility. Just under forty-eight hours later, Pulera attempted to hang himself in his cell. Fortunately, correctional officers noticed, swiftly cut him down, and called for an ambulance that saved his life.

Over his two days at the facility, Pulera never told any official that he was contemplating suicide. This appeal asks whether a long list of officials nevertheless unreasonably responded to other possible signs that Pulera was in distress, so that they may face liability for his injuries under 42 U.S.C. § 1983. The district court concluded there was no genuine dispute that all officials responded reasonably to the information each had, so it granted the defendants' motions for summary judgment. We affirm the judgment.

## I. Background

### A. Intake

In the early morning of Saturday, April 21, 2012, police stopped Edward Burke for a suspected hit-and-run. Pulera, Burke's cousin, was in the car's passenger seat, drunk. Officers arrested both men: Burke for the hit-and-run and Pulera for drinking in violation of a condition of his bond pending trial on state battery charges. According to the arresting officer's report (the accuracy of which Pulera does not dispute), Pulera appeared drunk but exhibited no suicidal behavior while in transit. When Pulera arrived at the facility, the intake officer on duty, Victoria Sarzant, and her supervisor, Dennis Zawilla, reviewed the arresting officer's report and placed Pulera and Burke in temporary holding cells across from each other.

Burke testified that he could just barely see and hear Pulera through their respective cell doors and the distance of the hall, but what he witnessed alarmed him. Though the solid door muffled the sounds and the small cell windows constrained his view, Burke saw that Pulera was "dragging his

thumb across his neck as if he was going to harm himself" and muttering "I'll just take myself out" because he was "done," all of which Burke understood by reading Pulera's lips. This went on for a while, and Burke testified that unidentified officers "in the vicinity" should have seen and heard Pulera, too. After about an hour, though, an officer took Burke out of his holding cell and booked him into the facility proper. Burke told the officer who transferred him, as well as one or two others, that he was concerned about Pulera hurting himself. Each brushed Burke off and, a few hours later, he left the facility.

Meanwhile, Pulera stayed in his holding cell. Although Sarzant had reported that Pulera was cooperative, if intoxicated, at 2 AM, he started to become more disruptive. By 5 AM, he was standing on a bench, pounding the door, and shouting. Based on this behavior—which Pulera explained was because he was cold and wanted a jacket—Sarzant held off on booking him and, near the end of her shift, prepared a report explaining why. Sarzant wrote that she saw no evidence Pulera was suicidal, just combative and possibly still intoxicated. Zawilla reviewed this report, too, and Pulera does not dispute the accuracy of its contents either.

After the shift change, Shane Gerber began the booking process. He screened Pulera using a standard form with medical and mental health questions and wrote down that Pulera's mother had died a month ago (but not that she had committed suicide) and that Pulera was prescribed medications. Pulera testified that he may have told Gerber of his mother's cause of death and that his brother had also committed suicide about a year before. The rest of the form Pulera thought

accurate. It reflects that Gerber saw no behavior suggesting a risk of suicide, and that Pulera answered "no" when asked whether he had ever contemplated or was presently contemplating suicide and to a battery of questions reflecting possible suicide risk factors.

Gerber also checked the facility's database for a "mental health special instruction" connected to Pulera but found none. This procedure resulted from a 2011 policy change to reduce the risk of inmate suicides after a string of attempts at the facility. The facility's database includes an instruction in the file of any arrestee who its officials had previously placed on "level one" suicide watch (the more restrictive and protective of the two levels the facility recognized). If a booking officer saw the instruction, he had to alert a supervisor, who would then perform a second, more thorough mental health risk assessment. During a prior stint at the facility in 2011, a crisis worker had placed Pulera on suicide watch after he told a nurse that he felt "really depressed" and his "mind was mess[ed] up" after his brother's suicide. The parties agree that the worker ordered only the less restrictive level two watch, however, so Pulera's file did not contain a special instruction in 2012. Without the instruction, the facility's policy required Gerber to order the additional risk assessment only if Pulera showed signs of contemplating suicide or had three risk factors. The death of a family member was one such factor, but Gerber found no others, so he placed Pulera in general population without requesting a second look.

## B. Medical Requests

Over the course of his day and a half in general population, Pulera submitted three inmate medical requests relating to his prescription medications—clonazepam and tramadol. Clonazepam is a benzodiazepine that Pulera was apparently prescribed for anti-anxiety purposes. Tramadol is an opioid pain-reliever that he used to treat chronic pain from a back injury.

Pulera submitted his first request a few hours after booking, around noon on Saturday. Cleaned of spelling errors, it said "I need my clonazepam and tramadol. My family is dropping them off. For my pain, anxiety, and depression." At around 4:30, Nurse Erica Rea responded, telling Pulera that he was under the care of the jail doctor and that she would notify the doctor after his family dropped off the medications.

As it turns out, Pulera's brother, William, had brought the prescriptions earlier that afternoon, and Rea reviewed them minutes after responding to the request. She saw that Pulera had refilled his prescription the day before, so he should have used just a couple of doses. Instead, the bottles contained only 34 out of the expected 60 clonazepam tablets, and 81 out of 120 tramadol tablets. She never asked, and no one ever discovered, where the missing pills went.

A half hour later, Rea called Dr. Karen Butler, the facility's medical director, who worked remotely except on Tuesdays. Rea reported the missing pills and asked whether she should distribute Pulera's prescriptions while he was in the jail. Dr. Butler declined to set up a regimen at that time and Rea noted that order in Pulera's chart. Testifying at her deposition, Dr. Butler explained that she made this decision based on the

missing pills, which she believed might be a sign of abuse and could have made further dosages dangerous. Neither Dr. Butler nor Rea recorded these thoughts in the medical record. Nevertheless, the jail's written policy supported her decision; it states, as a default rule, that non-compliant medications would not be continued while in custody.

That evening, at around 8 PM, Pulera sent his second request. Clarified, it read "My heart hurts. I can't breathe. I need my meds or I can die. My heart is pounding. They are here, I need you to please bring me my meds ASAP. Thank you."

Rea's shift had ended, so Nurse Denise Gilanyi received this request instead. She called a correctional officer to check on Pulera around 9 PM, and the officer said that Pulera was in no distress: he just wanted his medications. Gilanyi knew that Dr. Butler had decided not to set up the medications just hours before, and that neither prescription was "lifesaving," so she did nothing further. Near the end of her shift, at 5:55 AM, she wrote back to Pulera that the doctor had not set up any medications.

Pulera sent the third and final request on Sunday afternoon. This one—again cleaned up—said, "I can't eat, sleep. I am throwing up and I am dizzy. I can't breathe. I need my blood pressure taken. Please see me. My brother and mother just died. I need my clonazepam. I am sick." Within minutes, the nurse on duty, Markella Reed, responded, telling Pulera someone would check his blood pressure. Reed testified that she based this immediate response on her guess that Dr. Butler would order a blood pressure check, once they talked.

Reed further testified that between receiving the request and responding, she, like Gilanyi, had called a correctional

officer. This officer reported that Pulera was complaining he had a cold, walking around, making phone calls, and asking for a TV remote. Unlike Gilanyi, though, Reed did not add this conversation to the chart when it happened. Instead, she wrote it in a late entry the next day, after Pulera's suicide attempt.

When Reed called Dr. Butler, a few hours later, her prediction proved accurate. Dr. Butler ordered a vitals check, both to confirm Pulera's health and to get him face-to-face with a nurse. She asked that the nurse call her if anything abnormal came up. Reed added the doctor's new order to the chart.

At 6 PM, Reed left, and Nurse Sylvia Summers-Sgroi started her night shift. On reviewing the chart, Summers-Sgroi saw the order to take Pulera's vitals and to call Dr. Butler if anything was wrong. Around 8 PM, she met Pulera in a small room outside his cell block. She tested and recorded his blood pressure, pulse, respiration rate, blood oxygen level, and temperature. His results were not abnormal, indeed, they were excellent, and she saw nothing else concerning, so she did not call Dr. Butler. Although they disagree on the length of their meeting (Pulera said it lasted only a minute), both Pulera and Summers-Sgroi agree that he did not mention any concerns he had, let alone suicidal thoughts.

## C. Suicide Attempt

Sometime around 1:45 AM on Monday, April 23, Pulera attempted to hang himself with his bed sheets.

That night, Officer Bruce Clemens checked the cells every thirty minutes. He passed through Pulera's block at 1:35 AM and noticed nothing amiss. Ten minutes later, Clemens and another correctional officer, Duane Corso were talking in a

hallway next to the block when they heard an inmate yell "someone's hanging."

Upon hearing the yell, Corso immediately started toward Pulera's cell door. Clemens meanwhile ran to the guard station, which contained the controls for the cell and hall doors. He sent out a radio alert, and Corporal Darron Newton responded in about thirty seconds. Clemens handed Newton an emergency knife and opened the hall door, so Newton could join Corso, who was awaiting back-up outside Pulera's cell, as he was trained not to enter cells alone.

Once Newton made it to Pulera's cell with the knife in hand, Clemens opened the cell door for the two of them. Corso held Pulera up while Newton cut the bedsheet down. After Pulera was on the ground, someone called for an ambulance at around 1:50 AM.

Summers-Sgroi was still on duty, so she was the first medical responder. She recalled hearing the radio alert at 1:47 and arrived around 1:50, after Pulera was on the ground. Once she arrived at the cell, she began treating him with an oxygen mask. His vitals improved, but he remained unresponsive, and his eyes unfocused, so she continued to apply oxygen until the ambulance arrived at 1:57. By the time the sheriff's department got to the facility at 2:04, Pulera was already on his way to the hospital.

Pulera suspects that he decided to attempt to kill himself sometime after the last medication delivery of the night, when he realized that they were still not giving him his prescriptions. He testified that he was stressed, felt like he was going

to die because his heart was pounding, and kept envisioning his deceased mother and brother. He thinks he may have had withdrawal from "benzos." Other than through the medical requests, he did not recall passing any of this information on to facility officials or to his family.

William testified differently. He said that starting after he dropped off the medicine, Pulera frequently called saying that he had not received his prescriptions and was going to hurt or kill himself. Throughout the entire weekend, William explained, he called the facility repeatedly, trying to pass this information on. Though William had no idea when he called the facility or with whom he spoke, Summers-Sgroi admitted she had received one of his calls. Well after Pulera's suicide attempt, she wrote in a late entry that William had called demanding that Pulera get his clonazepam, but she transferred the call to a correctional officer when William started yelling.

### D. Procedural Background

Pulera eventually brought this suit under 42 U.S.C. § 1983 and state law against all the above-named officials, as well as the private company that employed the nurses, Visiting Nurses Community Care, Inc. (VNCC), and Kenosha County. The county's federal liability was premised on *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Under circuit precedent, so was VNCC's. *See Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982). (Pulera named even more defendants in the district court but has abandoned those claims on appeal.)

Pulera's expert on medical issues was Dr. Thomas White, Ph.D. Dr. White opined that the nurses' and Dr. Butler's

indifference to Pulera caused his suicide attempt. As a clinical psychologist, Dr. White had no expertise on medication and lacked the authority even to prescribe drugs. He, therefore, admitted he could not support a theory that, had Pulera received his prescriptions, he would not have attempted suicide. Instead, Dr. White contended that the lack of a face-to-face interview with a nurse or mental health worker was a possible factor in Pulera's attempt, although Pulera could have also decided to hang himself minutes before he tried. Dr. White also denied any link between withdrawal and suicide and, although lacking expertise in the area, he did not think there was evidence that Pulera had suffered withdrawal anyway.

The district court ultimately entered summary judgment for all defendants over the course of two orders. As an initial matter, the court concluded that Pulera was in the facility as an arrestee because he had not yet had a probable cause hearing on his suspected bail jumping. (A magistrate confirmed probable cause existed for Pulera's arrest only the morning after his attempt.) Accordingly, it applied a Fourth Amendment objective reasonableness standard to the defendant's actions, and not an Eighth or Fourteenth Amendment standard as would apply to convicted criminals or those detained after a probable cause hearing, respectively.

The court first granted Dr. Butler's motion. She had unsuccessfully argued for an Eighth Amendment standard, but the court concluded that even under the Fourth Amendment, there was no genuine dispute that her actions were objectively reasonable. Given the possible risk of overdose, the court determined that Dr. Butler had rationally withheld the

medications and awaited specific reports of symptoms before deciding whether to treat Pulera for withdrawal.

The court subsequently entered summary judgment for the remaining defendants. The non-medical defendants contended that a Fourteenth Amendment due process standard applied, but the district court stuck with its Fourth Amendment reasoning. It determined there was no evidence to show Sarzant heard Pulera's comments to Burke, Gerber overlooked present signs of Pulera's intent to harm himself, the county's booking policies were constitutionally deficient, or Zawilla did anything other than supervise. The court further concluded that Rea properly deferred to Dr. Butler, Gilanyi and Reed permissibly relied on officers' reports to assess Pulera's complaints of physical discomfort, and Summers-Sgroi rationally discounted William's phone call, as Pulera never reported suicidal thoughts to anyone at the facility. Because no nurse's actions were unreasonable in violation of the Fourth Amendment, the court recognized that VNCC and the county's policies could not have caused a constitutional violation for *Monell* purposes. Finally, the court ruled that the response defendants reasonably awaited back-up, which arrived within a minute or two, before they entered Pulera's cell and cut him down.

The court relinquished supplemental jurisdiction over the remaining state-law claims, and Pulera appealed.

## II. Discussion

We review the entry of summary judgment de novo. *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019). At summary judgment, the nonmovant plaintiff must provide evidence that, when viewed in the light most

favorable to him, suffices to prove every element of his claim for which he bears the burden of proof. *Id.* If the plaintiff fails to show at least a triable issue on each element, summary judgment is properly entered for the defendants. *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019).

As an initial matter, the parties differ on the proper standard that governs Pulera's claims—the Fourth or the Fourteenth Amendment. For those suspected of crimes, we have drawn the line between the two standards at the probable cause hearing mandated by *Gerstein v. Pugh*, 420 U.S. 103 (1975), and ordinarily held within 48 hours of a warrantless arrest, *Cty. of Riverside v. McLaughlin*, 500 U.S. 44 (1991). *See Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006). Before a finding of probable cause, the Fourth Amendment protects an arrestee; after such a finding, the Fourteenth Amendment protects a pretrial detainee. *Currie v. Chhabra*, 728 F.3d 626, 629–30 (7th Cir. 2013).[1]

Pulera maintains that he was an arrestee subject to the Fourth Amendment. In the non-medical defendants' contrary view, Pulera was properly classified as a pretrial detainee. Although a judge conducted a *Gerstein* hearing for Pulera's bail jumping charge the day after his suicide attempt, they argue that another judge found probable cause to arrest him for

---

[1] We have recognized that our distinction between pre- and post-hearing detention may need to be revisited after the Supreme Court, in *Manuel v. City of Joliet*, 137 S. Ct. 911 (2017), rejected our similar distinction in the malicious-prosecution context. *See Otis v. Demarasse*, 886 F.3d 639, 645 n.27 (7th Cir. 2018). Like in *Otis,* though, no party asks us to reconsider the issue, so we leave it for another day.

battery in 2011 and that this qualifies him as a pretrial detainee.

At oral argument, though, the parties all agreed that the standards are now effectively the same for judging the adequacy of custodial medical care under either Amendment. Under the Fourth Amendment, an arrestee must demonstrate that an official's actions were "objectively unreasonable under the circumstances." *Estate of Perry v. Wenzel*, 872 F.3d 439, 453 (7th Cir. 2017). This objective rule is easier for a plaintiff to meet than the subjective deliberate-indifference standard used under the Eighth Amendment. *Id.* For years, we also used the more onerous subjective approach for Fourteenth Amendment claims relating to conditions of pretrial detention. *See, e.g.*, *Pittman ex rel. Hamilton v. Cty. of Madison*, 746 F.3d 766, 775 (7th Cir. 2014). In 2018, however, we clarified that pretrial detainees' medical-care claims are now governed by an "objective unreasonableness inquiry." *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). Both standards, then, are objective, and the non-medical defendants identify no practical difference between them.

Accepting that concession, and without deciding whether the standards are identical in all respects, we see no reason to resolve whether Pulera was properly classified as an arrestee or a detainee. Either way, it was Pulera's burden to provide evidence that the defendants' actions were "objectively unreasonable" and caused his injuries. *Id.* at 347, 352 (Fourteenth Amendment); *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011) (Fourth Amendment). Reasonableness, in turn, must be determined in light of the totality of the circumstances. *See McCann v. Ogle Cty.*, 909 F.3d 881, 886 (7th Cir.

2018) (Fourteenth Amendment); *Florek v. Vill. of Mundelein*, 649 F.3d 594, 600 (7th Cir. 2011) (Fourth Amendment).

For VNCC and the county, Pulera also must demonstrate the elements of a *Monell* claim. This means he must have evidence of "(1) an action pursuant to a municipal policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal action was the 'moving force' behind the constitutional injury." *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020) (citing *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404–07 (1997)).

### A. Intake Defendants

Pulera first contends that Burke's testimony created a dispute whether Sarzant was aware of his suicidal thoughts. If Sarzant saw what Burke did, that might be true, but she testified she did not, and no competent evidence contradicts her testimony. All she saw was Pulera standing on a bench and yelling (which even he says was because he was cold, not because he was suicidal) and that was some time later. Critically, Burke did not identify Sarzant as one of the officials "in the vicinity" or whom he told of Pulera's distressed statements and gestures, and no other evidence places her near Pulera's cell at that time. All we have is an invitation to speculate that because Burke could (barely) see and hear Pulera, so could Sarzant. Speculation of this sort is not enough for a plaintiff to escape summary judgment. *See, e.g., King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 985 (7th Cir. 2020).

Next, Pulera argues that Gerber violated the county's policy by failing to review his history at the facility, recognize

that a crisis worker previously had him on suicide watch, and order a second mental health risk assessment. The county knew that Gerber and other booking officers ignored its special instruction policy, Pulera asserts, yet it allowed this noncompliance to persist.

One obvious flaw with these arguments is that Gerber followed the county's policy (which went beyond just the special instruction that we focus on here). The policy required him to obtain an extra risk assessment at booking if an arrestee had a special instruction reflecting that he previously had been on level one suicide watch. Gerber checked the database, but it is undisputed that Pulera's history included only a level two watch, so he did not have a special instruction. Even if Gerber had ignored the policy, though, a violation of a jail policy is not a constitutional violation enforceable under 42 U.S.C. § 1983. *See, e.g.*, *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006). The only question that matters for our purposes is whether Gerber or the county violated the Fourth Amendment.

Pulera has failed to show a genuine dispute on that issue. He argues that, given his answers at booking, Gerber should have known he was at a risk of suicide. Taking Pulera's version of the facts, as we must, he told Gerber that his mother and brother had both recently committed suicide and that his doctor had prescribed him clonazepam for depression. These scant comments do not raise an issue of fact. "[N]ot every prisoner who shows signs of depression … can or should be put on suicide watch." *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 558 (7th Cir. 2003). The same goes for every arrestee who also has had recent family deaths. *Id.* Given Pulera's express statement that he was not considering suicide and the

absence of more or more significant indirect signs, no rational jury could find that Gerber unreasonably placed Pulera in general population.

Pulera's theory against the county rests on his belief that Gerber did not follow the special instruction policy and that "ignoring a policy is the same as having no policy," *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004). The county, however, had a policy aimed at preventing suicide that Gerber did not ignore; one part of the policy simply did not apply to Pulera. So, to succeed on his *Monell* claim, he had to show that the county was deliberately indifferent to the risk that its polices (or a gap in them) would cause a constitutional violation. *Lapre v. City of Chicago*, 911 F.3d 424, 430–31 (7th Cir. 2018). He has not developed this argument by, for example, showing that county officials knew that formerly level-two arrestees were attempting suicide at heightened rates, and officials nevertheless made a "conscious decision not to act." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 966 (7th Cir. 2019). Certainly, the county could have expanded its policy to require second screenings of more arrestees, but the mere "existence or possibility of other better policies … does not necessarily mean that the defendant was being deliberately indifferent." *Lapre*, 911 F.3d at 431 (quoting *Frake v. City of Chicago*, 210 F.3d 779, 782 (7th Cir. 2000)).

The district court also properly entered summary judgment for Zawilla. He is not liable under § 1983 merely as a supervisor, even assuming his subordinates had erred. *See, e.g., Doe v. Purdue Univ.*, 928 F.3d 652, 664 (7th Cir. 2019). Zawilla did not have any personal contact with Pulera and merely reviewed reports that did not record any indications of suicide risk. Pulera presents no contrary argument.

## B. Dr. Butler

Next, Pulera argues that it was unreasonable for Dr. Butler to deny him his prescription medications without taking some alternative step. If she really believed he had abused his medications, he suggests, she should have implemented the facility's detoxification or withdrawal protocols.

Pulera, however, falls short with the medical and causation evidence. The record contains no evidence from which a factfinder could infer that, had Pulera received his medications, he would not have attempted suicide. His own expert denied such a theory. Dr. Butler's expert—Dr. Keith Ness, M.D.—declared in his affidavit that cutting a patient off either clonazepam or tramadol, even "cold turkey," was not known to make that patient suicidal, whereas giving either drug to someone who had consumed them in excess within the past few days could have been dangerous. Pulera offered nothing to rebut this medical opinion.

Dr. Butler made a reasonable decision on imperfect information. She knew only that many of Pulera's pills were missing. Putting aside the facility's policy directing her not to set up his medications in this situation, there was at least *some* chance that he had taken those pills and giving him more could have been harmful, even deadly. Between the option with some risk of death and the option with no apparent risk (according to the only medical evidence in the record), Dr. Butler chose the latter. That choice was objectively reasonable as a matter of law, regardless of whether Pulera had, in fact, abused his medications.

A jury could not infer that depriving Pulera of his medications might be deadly from the mere fact that a physician had

prescribed them to him. Pulera insists a prescription is evidence of a "serious medical need." *See Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (defining term to include a need "that has been diagnosed by a physician as mandating treatment"). Whether a medical need is serious, though, is just a threshold requirement before the state has a duty under the Eighth Amendment to provide medical care to a prisoner. *Id.* at 1369, 1372. We have held that there is no such threshold under the Fourth Amendment, as the "reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor—the scope of the requested treatment." *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007).

From what Dr. Butler and the nurses knew, Pulera's need for his medications was not serious relative to the risks of his receiving them. Pulera likens his situation to that of a diabetic deprived of insulin. *Egebergh v. Nicholson*, 272 F.3d 925, 928 (7th Cir. 2001). But a diabetic needs insulin to live. No evidence suggest that Pulera depended on his medications to stay alive; he needed them only to treat his pain and anxiety.

Undoubtedly, a jury could infer that the defendants knew Pulera might become anxious or suffer chronic pain without his medications, but he points to nothing that would inform them that this anxiety or pain might lead him to attempt suicide or otherwise cause harm comparable to a risk of overdose. His reliance on *Gil v. Reed*, 381 F.3d 649 (7th Cir. 2004), is misplaced. We held in *Gil* that a jury could infer a prison doctor's deliberate indifference when a specialist prescribed certain medications noting the risks of alternative treatments,

the doctor ignored that warning, and the prisoner suffered as predicted. *Id.* at 662–64. If Pulera's primary care physician prescribed him clonazepam and tramadol because he was known to be suicidal without them, that fact is missing from the record. Based on the evidence that is in the record and of which she was made aware, Dr. Butler reasonably concluded the only foreseeable risk of depriving Pulera of his prescriptions was a few days' discomfort—a small price to pay compared to even a low chance of overdose. All four nurses were entitled to defer to Dr. Butler's medical judgment weighing the costs and benefits of these two choices. *See McCann*, 909 F.3d at 887 (affirming summary judgment for nurse who deferred to doctor's prescription that led to overdose).

Pulera makes much of the fact that Dr. Butler never implemented a withdrawal or detoxification protocol, despite her asserted belief that he was abusing his medications. But, as Pulera himself emphasizes, Dr. Butler knew only that it was possible that Pulera had abused his medications. We agree with the district court that Dr. Butler could reasonably have awaited a nurse or correctional officer's report of concrete symptoms before making further treatment decisions. When Nurse Reed did report symptoms, on Sunday evening, Dr. Butler asked that someone check Pulera's vitals and call her if any abnormalities arose. She heard nothing back, so it was reasonable for her to infer (correctly) that all objective signs showed Pulera was fine and not suffering withdrawal. She never had the opportunity to take this new information into account and reassess Pulera's medication regimen because of his attempt a few hours later.

**C. The Nurse Defendants**

Moving on to the individual nurses' actions, we agree with the district court that Nurse Rea reasonably responded to Pulera's first medical request, which did not give her notice of any serious problems, let alone a risk of suicide. Pulera simply asked that she deliver his medications "for [his] pain, anxiety, and depression." He did not even mention symptoms. Indeed, contrary to Pulera's argument, he did not say he *was depressed*, only that the pills were *for depression*. Any rational factfinder would see this message the way Rea did: as a simple request for medicine. She reasonably responded to that request by telling Pulera he would receive his medications, if Dr. Butler approved them. She then gave Dr. Butler all the information necessary to decide not to approve them.

The request that Pulera sent to Nurse Gilanyi did include symptoms—*physical* symptoms. Pulera complained that his heart was pounding and hurt, that he could not breathe, and that he needed his medications or he could die. That Pulera was concerned about dying, or even that he might have been having an anxiety attack, did not put Gilanyi on notice that he might be contemplating suicide. The request signaled that he feared dying not from self-harm, but from a heart attack or lack of oxygen. A correctional officer was qualified to confirm that Pulera was, in fact, breathing and not apparently in cardiac arrest, so it was reasonable for Gilanyi to ask one to do so and rely on his assessment. Like in *Florek*, 649 F.3d at 600, summary judgment was proper because Pulera's "outward appearance did not put officers on notice" of his condition despite his complaints of serious symptoms. (And unlike Florek, who did suffer a heart attack, there is no evidence those

serious symptoms ever manifested.) With the officer's confirmation that Pulera was fine and just wanted his medications, Gilanyi appropriately responded that the doctor had not prescribed them. The Fourth Amendment requires that arrestees receive reasonable care, not specific care, no matter how many times they ask. *Id.* at 600–01 (citing *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008)); *see also Williams v. Ortiz*, 937 F.3d 936, 944 (7th Cir. 2019) (same under Fourteenth Amendment).

Pulera resists the comparison to *Florek* and instead bases his argument on *Belbachir v. Cty. of McHenry*, 726 F.3d 975 (7th Cir. 2013). We recognized in *Belbachir* that "[a] severely depressed person who has hallucinations, acute anxiety, and feelings of hopelessness and helplessness and who cries continually, talks incessantly of death, and is diagnosed as suicidal, is in obvious danger." *Id.* at 982. Pulera's request, though, did not put Gilanyi on notice of any of these facts or anything similar. At most, one might be able to infer she had notice that Pulera was suffering "acute anxiety," but we affirmed summary judgment for the nurse who knew only of Belbachir's anxiety and panic attacks and not her other issues. Just like that nurse, Gilanyi was not even negligently responsible for a suicide risk that Pulera never told her about. *Id.*

Regarding Nurse Reed, Pulera argues that her calling a correctional officer to check on him was an unreasonable response to his third medical request. Just like the second, though, Pulera's most pressing assertion was that he could not breathe. A call to a correctional officer to physically check

on him was one reasonable way for Reed to confirm that Pulera was not in immediate danger.[2]

Pulera's third request admittedly went further than his second and mentioned other symptoms—he was vomiting, dizzy, and just generally sick—but Nurse Reed, too, went further than relying on the correctional officers' report. She informed Pulera that someone would check his blood pressure and called Dr. Butler, who expanded it to a full vitals check. This was a reasonable response to Pulera's remaining complaints, which while certainly worthy of investigation, were not an apparent emergency. *Cf. Gayton v. McCoy*, 593 F.3d 610, 621 (7th Cir. 2010) (noting that "[v]omiting, in and of itself, is not an uncommon result of being mildly ill, and, absent other circumstances … does not amount to an objectively serious medical condition" under the Eighth Amendment). At the vitals check, Pulera would be face-to-face with a nurse who could see his symptoms and hear anything he had to say.

When Nurse Summers-Sgroi performed the check, she saw nothing wrong and Pulera admits he never said a thing about other symptoms or suicidal thoughts. Pulera bases his claim against her on his brother William's phone call. Summers-Sgroi contends that this call did not give her notice of a risk of suicide because all she heard was yelling about clonazepam before she transferred the call. William, though,

---

[2] Although the timeline surrounding this call to the correctional officer is jumbled, Pulera does not develop an argument that Reed did not in fact call the officer. Even if he disputed whether she had, though, Pulera would still have a problem with causation. A delayed response to Pulera's reported symptoms might be concerning, but there is no evidence that Pulera's injuries resulted from those symptoms.

disputed this story; he says he told whoever he spoke with that Pulera was suicidal and never admitted yelling. That this call came from an outside source does not "refute the receipt of notice." *Ortiz*, 656 F.3d at 533.

Still, even under Pulera's version of the facts, it was not objectively unreasonable for Summers-Sgroi to discount the call. Though no one knows whether she received the call before or after the vitals check (or even Pulera's attempt), at best she had either just seen Pulera or was just about to see him. When confronted with a healthy patient who mentioned no problems and an outside caller saying the patient was distraught, a reasonable nurse could believe her own observations over the phone call. Indeed, that is precisely what we suggested the defendant who answered the phones in *Ortiz* should have done, given a jail's understandable hesitance to accept medical requests from outside sources. *Id.* at 529. Summers-Sgroi saw Pulera and observed no reason whatsoever to believe Pulera was suicidal—Pulera admits he did not tell her he was suicidal and does not contest her determination that his vitals were "excellent." Under these circumstances, it was not unreasonable for her to take no special precautions against his attempted suicide.

Because Pulera's individual claims against the nurses fail, so too must his *Monell* claims against VNCC and the county. Although individual liability is not always a prerequisite for municipal liability, *see Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017) (en banc), Pulera argues only that the facility inadequately trained its nurses and had a de facto policy permitting them to delegate all their duties to correctional officers. Even assuming Pulera could prove the training inadequate or the lax policy unconstitutional, he cannot show

causation. *See id.* at 379 ("The central question is always whether an official policy, however expressed … caused the constitutional deprivation."). The nurses acted appropriately under the circumstances, both generally and to the extent they relied on correctional officers, so their alleged lack of training and overreliance on officers could not have caused Pulera's injuries. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury … the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.").

### D. Response Defendants

Finally, Pulera contends that the district court erred in entering summary judgment for officers Clemens, Corso, and Newton. In his view, the officers violated his rights when they wasted seconds waiting for back-up before entering his cell, cutting him down, and calling an ambulance.

No rational jury could agree with Pulera's hindsight-laden assessment of the officers' actions. "The Fourth Amendment requires reasonableness, not immediacy." *Sallenger v. City of Springfield*, 630 F.3d 499, 504 (7th Cir. 2010). Even with the delays Pulera criticizes, it is undisputed that the officers sprang into action, had the pressure off his neck in less than two minutes, and summoned an ambulance in less than five, by which time Summers-Sgroi was already providing emergency treatment. Perhaps the officers could have acted faster, but the Constitution does not demand perfection. *See id.*; *see also Florek*, 649 F.3d at 600 ("[T]he Fourth Amendment reasonableness inquiry necessarily takes into account the sufficiency of the steps that officers did take"). Nor does it demand that a correctional officer enter a potentially dangerous situation

before back-up can arrive. *Giles v. Tobeck*, 895 F.3d 510, 514 (7th Cir. 2018) (per curiam). Under the totality of the chaotic circumstances, the officers' swift actions were indisputably reasonable and preclude a finding that they violated Pulera's constitutional rights.

### III. Conclusion

It is unfortunate that Pulera attempted to kill himself and fortunate that he did not succeed. That a tragedy almost happened under the watch of jail officers, though, does not mean the officers are responsible. All that one can expect—and all the Constitution demands—is that officials respond reasonably to the situation presented. Because there is no genuine dispute that all the defendants here did so, we AFFIRM the judgment of the district court.v