In the

# United States Court of Appeals
### For the Seventh Circuit

---

No. 23-2141

ESTATE OF GAVIN WALLMOW, by its Special
Administrators Matthew and Michelle Wallmow,

*Plaintiff-Appellant*,

*v.*

ONEIDA COUNTY, *et al.*,

*Defendants-Appellees*.

---

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 22-cv-241-jdp — **James D. Peterson**, *Chief Judge*.

---

ARGUED FEBRUARY 8, 2024 — DECIDED APRIL 17, 2024

---

Before EASTERBROOK, SCUDDER, and ST. EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. On the Fourth of July, 2021, police booked Gavin Wallmow into an Oneida County jail. Four days later he died by suicide in his cell. His is a tragic story. But it does not, as his estate alleges, implicate the Constitution. The district court reached the same conclusion in granting summary judgment to the defendants, and we affirm.

### I. Background

Since this case arose on summary judgment, we recount the facts in the light most favorable to Wallmow's estate. *See Moran v. Calumet City*, 54 F.4th 483, 491 (7th Cir. 2022).

On July 4, 2021, Rhinelander Police Department officers arrested Gavin Wallmow and took him to the county jail after he violated the terms of his probation. The department gathers information on arrestees on a standardized form called a "gray sheet." For Wallmow, the arresting officer marked "no" in each of four places based on his interactions with Wallmow: "threat of suicide," "medical problems," "violent behavior," and "other." Once Wallmow arrived at the jail, a correctional officer named Sergeant Glenn Kortenhof reviewed the gray sheet before asking Wallmow stock booking questions. Some of these aimed at determining if he had suicidal tendencies: Wallmow represented that he was not feeling suicidal, had no suicidal or self-mutilation inclinations, suffered from no mental disability, and was not under psychiatric care. Kortenhof noted that Wallmow did not display any odd behavior and appeared lucid, though he had been drinking. In keeping with the jail's coronavirus protocols, officers booked Wallmow into a single-occupancy cell.

Two days later Alexis Bunce, Wallmow's probation officer, paid him a visit. Things went smoothly at first, with Wallmow again denying suicidality. Then Bunce asked Wallmow what had happened with his sister—police were investigating allegations that Wallmow had sexually assaulted her—and the conversation took a dark turn. Wallmow's demeanor transformed. He began to alternately laugh and cry, say "demonic" things, and hit himself. He worried aloud that his parents planned to "psionically" harm him. He said Bunce was

"talking to a dead man." And he suggested that at a psychiatric treatment facility, medical personnel might force him to drink his intestines from a cup. At one point he told Bunce he felt his skin burning as he entered hell.

Understandably concerned, Bunce called Katie Rudolph, a corrections officer at the jail. Bunce relayed that Wallmow was acting oddly, that he had been hitting himself, and that he was having "demonic" thoughts. The call lasted less than a minute.

In turn, Rudolph called Wallmow's cell block, telling the on-duty officer to watch out for him. Next, following department policy, Rudolph called her boss, Sergeant Carrie Holewinski, recounting Bunce's observations that Wallmow was acting oddly, that he had been hitting himself, and that he was having "demonic" thoughts. There may have been more to both calls—Bunce to Rudolph, Rudolph to Holewinski—but the record is inconclusive on that point. At any rate, Holewinski took note on a "muster," a log officers use to pass information from one shift to the next. Her entry read: "Keep an eye on Wallmow in Secure G 3. According to his probation agent, he was acting a little weird and talking about 'demonic' stuff." While in that cell block, Wallmow was the subject of observation at least 37 times per day through a combination of cell checks, walkthroughs, and head counts. During this time he behaved normally.

Two days later, July 8, Officer Matthew Turkiewicz and a nurse asked Wallmow at 6:15 PM if he might like to be tested for coronavirus; a negative test would mean a move into the general population. Wallmow agreed. While the pair administered the test, Wallmow behaved normally, and the results came back negative. But rather than moving immediately into

the general population, Wallmow remained in his same block. From the "secure pod," a place where correctional officers may safely sit and monitor those cells, Wallmow's cell was visible on closed-circuit camera, though not with the naked eye. Officers in the secure pod had to perform a visual cell check once per hour or more. One could do this without leaving the pod, relying instead on the camera.

Later that evening, an officer named Reed Symonds took over as the secure pod operator. Symonds knew from the muster to keep an eye on Wallmow. He also reviewed the booking information on Wallmow, including the gray sheet suggesting no risk of suicide. Symonds conducted required visual cell checks at 7:31, 8:10, and 9:01 PM. Each passed uneventfully.

Cameras recorded much of what follows, but the recording cuts in and out. Here is what we know: At 9:04 PM, Wallmow sits down on the bottom bunk of his cell. The camera cuts out. When it restores the picture at 9:06, Wallmow has hung a mattress cover from his bed over the top bunk, occluding a view of the bottom bunk. The jail's rules prohibited this practice, but even so, some inmates would break the rule for privacy. By 9:07, Wallmow's legs can be seen kneeling by the bed. Then he extends his legs, curls up, and extends his legs again. His head cannot be seen behind the cover. He seems to be in a plank position with his arms on the bed and legs on the floor. Again the camera cuts out. From what we can discern at 9:16, Wallmow appears to be lying outstretched, legs on the floor and torso on the bottom bunk. He is still for the remainder of the recording.

At 9:43 Symonds ran another cell check. (That was 42 minutes after the last one, which complies with the once-per-

hour policy.) He does not remember whether he noticed the bunk covering. At 9:49, Turkiewicz took over as the secure pod operator. A minute later, Turkiewicz conducted his own cell check and reported no issues. He did see the mattress cover, but does not remember seeing Wallmow.

At 10:00 Kortenhof and Symonds came to lock down the block. That process entails checking the cells by walking past—not just reviewing the video. At 10:10, Kortenhof reached Wallmow's cell to find Wallmow kneeling with his knees on the ground and torso on the bunk. After quickly obtaining backup, Kortenhof entered the cell, where Wallmow lay unresponsive. Kortenhof found Wallmow's pants tied around his neck, with their other end tied to the bed. Wallmow's face was purple, and he was bleeding from his nose. Kortenhof and others tried to resuscitate Wallmow without success. An ambulance rushed Wallmow to the hospital, where doctors ultimately pronounced him dead at 11:36 that same night.

Wallmow's estate brought a series of constitutional claims under 42 U.S.C. § 1983 on the theory that the jailers failed to protect Wallmow from himself. The defendants are Rudolph, Holewinski, Symonds, Turkiewicz, and Oneida County. The claims run against the officers in their individual capacities, and against the County as a *Monell* claim. The district court granted summary judgment for the defendants, applying constitutional standards that require the Estate to show that the defendants' individual behavior was objectively unreasonable. That element doomed the Estate's claims because the district court held the record did not support an inference that any defendant knew Wallmow faced a serious risk of harm. And as for the County, the court found no reason to think its

policies were so plainly inadequate as to justify liability without any pattern of suicides to put it on notice. The Estate appealed.

## II. Analysis

The district court was correct. We begin by explaining why no defendant acted in an "objectively unreasonable" manner before turning to the Estate's *Monell* claim, which falls short for want of an offending policy.

### A. Individual Defendants

The Estate claims Rudolph, Holewinski, Symonds, and Turkiewicz failed to protect Wallmow from himself. Claims like these can fall under the Fourth or Fourteenth Amendment, depending on the person's status. "Before a finding of probable cause, the Fourth Amendment protects an arrestee; after such a finding, the Fourteenth Amendment protects a pretrial detainee." *Pulera v. Sarzant*, 966 F.3d 540, 549 (7th Cir. 2020). Because the standards are often interchangeable, we need not always decide which standard applies to dispose of a case. *Id.* at 550.

This case is one of those. We have not decided the applicable constitutional provision where, as here, the injured party came in on a probation hold and awaited adjudication at the time of the harm. *See Estate of Clark v. Walker*, 865 F.3d 544, 546 n.1 (7th Cir. 2017). But the parties agreed to use the Fourteenth Amendment below and have abided by that choice here. Regardless, nothing relevant separates the Fourth and Fourteenth Amendments in this context.

Under either test, a plaintiff must show that declining to take preventative action was "objectively unreasonable." *Pulera*, 966 F.3d at 550. More specifically, that standard asks a

plaintiff to establish that a "defendant did not take reasonable available measures to abate [the] risk, *even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved*—making the consequences of the defendant's conduct obvious." *Kemp v. Fulton County*, 27 F.4th 491, 496 (7th Cir. 2022). And factfinders may consider only information available at the time, resisting the temptation to employ "the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Last note: the inquiry takes a broad view, looking at any "objective circumstances potentially relevant to a determination" of reasonableness. *Id.* These include the prevailing penal circumstances at the facility, accounting for the need to "preserve internal order and discipline and to maintain institutional security." *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)).

Our past cases have applied this law to jailhouse suicides, together setting forth key principles for assessing objective unreasonableness. An "express statement that [the deceased] was not considering suicide" from the deceased himself weighs heavily against objective unreasonableness. *Pulera*, 966 F.3d at 551; *see also Jump v. Village of Shorewood*, 42 F.4th 782, 794 (7th Cir. 2022). That conclusion flows from a recognition of on-the-ground circumstances: practically speaking, "[n]ot every prisoner who shows signs of depression can or should be put on suicide watch." *Id.* (cleaned up). The facts should point directly at suicidality, for a deceased's "general distress and history of psychiatric treatment would give a reasonable officer notice of general distress and a history of psychiatric treatment, not risk of suicide." *Jump*, 42 F.4th at 794. For that reason, "when an officer has no reason to think a detainee is suicidal, it is not objectively unreasonable to take no special precautions." *Id.* at 793.

This case is in the mold of *Pulera* and *Jump*, which were themselves "factually indistinguishable" from one another. *Id.* In both those cases, as in this one, the detainee was intoxicated at the time of booking and confirmed at booking that he was not contemplating suicide. *Id.* In *Pulera*, as here, the deceased had spoken with medical professionals without giving any sign of suicidality. 966 F.3d at 546–47. And in both cases, the deceased showed some warning signs: Pulera told others that he might die without anti-anxiety medication, *id.* at 546, and another in the cell block reported Pulera "dragging his thumb across his neck as if he was going to harm himself," *id.* at 545, while in *Jump* the deceased was seen "slamming his body against the cell bars," 42 F.4th at 793. We affirmed the summary judgment for the defendants in both those cases.

We do the same today because, even viewed in the light most favorable to the Estate, the record does not support that "the consequences of the defendant's conduct [were] obvious." *Kemp*, 27 F.4th at 496. To be sure, Wallmow's talk with Bunce ended on a disturbing note. But no defendant handled the situation in an objectively unreasonable way.

Before turning to the individualized arguments, though, the Estate notes that the Fourteenth Amendment standard can make an officer liable if he "was aware of a serious risk of harm in some form." *Velez v. Johnson*, 395 F.3d 732, 736 (7th Cir. 2005). That much is true: the Fourteenth Amendment extends past deaths by suicide and sweeps in less grave injuries. But the Estate makes too much of this rule. In *Velez*, there could be no doubt about a serious risk of harm. The plaintiff had already told the defendant guard about a conflict with the eventual aggressor—and when the conflict escalated to a rape at knifepoint, the plaintiff pushed an "emergency call

button." *Id.* The guard "did nothing." *Id.* This case is different: where in *Velez* the guards sat on their hands despite the inmate's call for aid, these officers took numerous steps to "keep an eye" on Wallmow even as he insisted he would not harm himself, telling Kortenhof at booking that he had no "suicidal or self mutilation tendencies." They were not on notice of any serious risk of harm, even considered more broadly. That flaw plagues each of the Estate's claims. And none of its arguments particular to one or another defendant saves them from summary judgment.

*Rudolph and Holewinski.* The Estate urges us to hold this pair to the same standard as a reasonable officer at booking. Piecing that argument together with the jail's rule requiring booking officers to refer disturbed inmates to a mental health provider, it infers that Rudolph and Holewinski violated the Constitution by failing to do so. That conclusion does not follow. As the Estate admits, "a violation of a jail policy is not a constitutional violation." *Pulera*, 966 F.3d at 551. Seeking to surmount that hurdle, the Estate suggests the jail's policy bears at least some probative force toward objective reasonableness. It marshals two out-of-circuit precedents. *See Darden v. City of Fort Worth*, 880 F.3d 722, 732, n.8 (5th Cir. 2018); *Gutierrez v. City of San Antonio*, 139 F.3d 441, 448–49 (5th Cir. 1998). Those cases, though, were different. Both involved policies meant to apprise officers of severe, non-obvious risks, such as the chance that cuffing an obese person's hands behind their back and laying them down might cause asphyxiation. To borrow our language from *Kemp*, the policy "ma[de] the consequences of the defendant's conduct obvious" instead of obscure. 27 F.4th at 496. Officers need no such policy to know what risks mental illness poses, though, so these cases prove little.

The Estate's next argument faults Rudolph and Holewinski for not ensuring that certain details made it to the end of the communication chain. Bunce, the probation officer, told Rudolph that Wallmow was acting strangely, talking about demons, and hitting himself. (The Estate argues a jury could infer Bunce told Rudolph more, relying on the two women's foggy memories on the call's specifics. But a "lack of recollection of [one's] conversation … does not create a genuine issue of fact" about its contents. *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 478 (7th Cir. 2011). That does not pass muster at summary judgment.)

Holewinski recorded only those first two facts in the muster, not logging that Wallmow had hit himself. The objective unreasonableness prong asks a plaintiff to show "a reasonable officer in the circumstances would have appreciated the high degree of risk involved." *Kemp*, 27 F.4th at 496. No high degree of risk was involved in declining to record the detail about Wallmow hitting himself. Holewinski acted quickly and took down the gist, that Wallmow had been behaving oddly and merited extra attention. The result of the two conversations was the note in the muster to keep an eye on Wallmow. Both Rudolph and Holewinski behaved reasonably by acting quickly on the information they had rather than waiting to put together a complete account.

*Turkiewicz and Symonds*. The Estate charges the cell block operators with failing to act when Wallmow used his bed covering to obscure the view of his bed. A jail policy prohibited inmates from putting up such coverings, but officers rarely enforced the rule. So too with these officers: Symonds does not recall seeing the sheet, and Turkiewicz saw it but did not immediately take it up with Wallmow. By that time, the

comprehensive cell check was just twenty minutes away. It would have afforded a good time to apprise Wallmow of the rule.

The cell block operators acted reasonably in waiting to enforce the rule. That is especially so since these covers often hung from inmates' beds, affording them privacy. The cell block operators had seen many covers arranged like this one, and no inmate at the jail had ever died by suicide, let alone by using a sheet to shield the act from view. And so the consequences of leaving the cover in place were not obvious, and in turn there was no objectively unreasonable conduct.

This case is like *Jump* and *Pulera* before it. The jail's employees were concerned about Wallmow's behavior, so they took precautions. At least 37 times per day, officers checked on Wallmow without seeing anything amiss. Four hours before he made the attempt on his life, a nurse saw Wallmow, administered a COVID test, and noted no disturbance or unusual behavior. Tragedy struck in spite of all this, but that fact does not render the precautions constitutionally inadequate.

**B. The County**

That leaves the Estate's claim against the County, which suffers from a more fundamental defect. Because the Estate's suit proceeds under 42 U.S.C. § 1983, under which municipalities' liability does not flow from employees' bad acts, it must prove the County's own involvement under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). That entails a three-part test: the Estate must show "(1) an action pursuant to a municipal policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation,

meaning the municipal action was the 'moving force' behind the constitutional injury." *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020). We need not go past the first.

At bottom, the Estate fails on the first prong because the "policy" it alleges is not a policy at all. Although the facts bear out the Estate's claim that officers did not always conduct cell checks with unflagging rigor—often allowing inmates to leave bed coverings hanging and not always putting eyes on each inmate, since the cameras did not show all parts of each cell—the jail's on-point policy did call on officers to observe each inmate at least once an hour and to look for such abnormalities. The Estate's response is to argue the lax enforcement of the policy is a custom in the jail that *amounts* to a policy decision. Such claims can prevail only where the lax practice was "so pervasive that acquiescence on the part of policymakers was apparent." *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020) (quoting *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006)).

That bar is too high to clear on these facts. To be sure, Symonds testified that some rules and regulations enjoyed stricter enforcement than others, and that the rule against hanging bed coverings fell on the slacker side. But he also explained that the cell block that housed Wallmow was for newer inmates, and longer-tenured inmates would have been told "you can't hang stuff." Officers did enforce the policy, even if not against newcomers. There was no acquiescence on the County's part in ignoring the policy, no custom of allowing inmates that small privacy.

Nor can the Estate establish, as it must, that the county's inaction bore a "known or obvious risk" of causing constitutional violations. *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520

U.S. 397, 410 (1997). The undisputed evidence here reveals that Wallmow's was the first death by suicide in the jail's 20-year history. Only once before had an inmate made a serious attempt on his own life, and on that occasion an officer intervened to save his life.

### III. Conclusion

Wallmow's fate is tragic. Jails should, and often do, have policies that help connect people at risk of death by suicide to mental health resources and get them the help they need. Indeed, Oneida County Jail has those policies and those resources, though no one brought them to bear on Wallmow. The problem with the Estate's claim is that we cannot indulge the temptation to employ hindsight. Wallmow thrice disavowed that he was at risk, the jail took him at his word, and after his talk with Bunce nothing indicated otherwise. So the jail resolved to keep an eye on Wallmow without taking more intrusive steps. That course complies with the Constitution's requirements.

The judgment of the district court is

AFFIRMED.